1  LAURENCE F. PULGRAM (CSB NO. 115163)
   *lpulgram@fenwick.com*
2  JEDEDIAH WAKEFIELD (CSB NO. 178058)
   *jwakefield@fenwick.com*
3  ALBERT L. SIEBER (CSB NO. 233482)
   *asieber@fenwick.com*
4  LIWEN A. MAH (CSB NO. 239033)
   *lmah@fenwick.com*
5  FENWICK & WEST LLP
   555 California Street, 12th Floor
6  San Francisco, CA  94111
   Telephone:     (415) 875-2300
7  Facsimile:     (415) 281-1350

8  Attorneys for Defendants
   CHORDIANT SOFTWARE, INC., DEREK P. WITTE,
9  STEVEN R. SPRINGSTEEL, OLIVER WILSON

10

11 DONGXIAO YUE
   2777 ALVARADO ST., SUITE C
   SAN LEANDRO, CA 94577
12 Telephone:     (510) 396-0012
   Facsimile:     (510) 291-2237
13 E-Mail:        ydx@netbula.com

14 Plaintiff (*Pro Se*)

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONGXIAO YUE,<br><br>                    Plaintiff,<br><br>v.<br><br>CHORDIANT SOFTWARE, INC., et al.,<br><br>                    Defendants. | Case No.  C-08-00019 JW<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT (CONFERENCE SCHEDULED FOR MAY 5, 2008)**<br><br>Date:     May 5 2008<br>Time:     10:00 A.M.<br>Dept:     8, 4th Floor<br>Judge:    Hon. James Ware<br><br>Trial Date:  No date set |

JOINT CASE MANAGEMENT CONFERENCE
STATEMENT

CASE NO. C-08-00019-JW

Pursuant to the Court's April 16, 2008 Order setting a Case Management Conference on May 5, 2008, Plaintiff Dongxiao Yue ("Yue") and Defendants Chordiant Software, Inc. ("Chordiant"), and Chordiant employees or officers Derek P. Witte, Steven R. Springsteel, and Oliver Wilson (collectively, "Chordiant Individual Defendants") jointly submit the following statement.

## CURRENT POSTURE

As the parties have not reached agreement on a description of the status of the present case, the parties submit separate descriptions below.

**1.  PLAINTIFF'S DESCRIPTION**

Plaintiff offers the following description of the events underlying the instant dispute.

**A.  Factual background**

**1.  PowerRPC software components**

Yue began developing the PowerRPC software in 1994[1]. In July 1996, Yue founded a company named Netbula, LLC ("Netbula") to market PowerRPC. PowerRPC consists of many programs, program modules and source code files. The PowerRPC software contained two parts: (1) the "Software Development Kit" ("SDK") that consists of the software tools which allow programmers to create applications based on PowerRPC technology, including the "powerrpc.h", "pwrpcapi.h", "pwrpc32.lib", "pwrpc32.dll" and other files; and (2) the "runtime software" that consists of files providing the core remote call functionality to applications developed with PowerRPC , including the "pwrpc32.dll", "pmapsvc.exe", "portmap.exe" and other program files. Yue has always owned the copyrights of the PowerRPC software created before July 1996. Some of the software source code has Yue's personal copyright notices. Yue owns the copyrights of the derivative works by a written assignment executed in September 2007. The pre-Netbula work Yue created has a pending registration at the Copyright Office.

---

[1] This is an undisputed fact in the *Netbula v. BindView* case. See Docket No. 257 of that case, Joint Statement of Undisputed Facts co-signed by Jedediah Wakefield.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT    -1-    CASE NO. C-08-00019-JW

### 2. PowerRPC software licenses

A purchaser of PowerRPC software must buy one type of license (an "SDK" license) for each computer programmer who will use the PowerRPC SDK files to develop RPC applications. A purchaser must also buy a separate server or client license for the right to copy the runtime software files, also including the "pwrpc32.dll" file. Each SDK license and runtime license (server or client) is only granted for a single computer and might only be granted for use in one specific operating system environment, for example, "Windows Server 2003" but not "Windows Vista", depending upon the specific license grant. A server runtime license cost about $800 per server machine. The client runtime licenses were sold in "packs" of different sizes. A 20-pack client runtime license, which granted a customer the right to use the runtime software for client application on twenty (20) computers, cost about $1000. The PowerRPC portmapper program—pmapsvc.exe—was sometimes licensed at standalone basis at the price of $100 per copy.

### 3. Yue's interaction with Chordiant Software, Inc. ("CSI") and Individual defendants

In 2007, based on communications from CSI's customers, Yue became aware that defendant CSI has been using PowerRPC portmapper in its software product called "Chordiant Marketing Director" ("CMD"). Yue suspected that CMD consisted of both PowerRPC server and client applications, which would require both server and client runtime licenses.

Also, in 2007, based on technical support questions from Oliver Wilson – the manager for the CMD product, Plaintiff understood that CSI was developing a version of CMD for Windows Vista.

Yue had no prior business relationship with defendant CSI and the individual defendants.

Yue then made numerous attempts to ascertain CSI's extent of copying of PowerRPC. After multiple e-mail communications and a telephone conversation, Oliver Wilson stated that CSI would be providing a requested report which would include date of installation, operating system type, license usage type (client or server) and number of copies. However, subsequently, Derek P. Witte, the Vice President of CSI, evaded the license inquiry and made every effort to

1  conceal the relevant information. Plaintiff then sent a letter to CSI's President and CEO, Steven
2  R. Springsteel, requesting a full software usage report. CSI and Witte continued to evade
3  providing information on their usage and copying of the PowerRPC software. For instance,
4  Plaintiff inquired many times on whether CMD product used PowerRPC in server applications
5  (which would require server license), Wilson and Witte evaded this question or provided partial
6  and misleading answers (by stating that PowerRPC was used in a VB.NET client).

Based on Plaintiff's limited online research, CSI's use of PowerRPC in its CMD products includes both RPC server and RPC client applications. The CMD software includes a PowerRPC server application (named "v_rpcangelproc" in certain versions of CMD). This server provides, as its name suggests, marketing services to a company or organization's marketing or sales staff, which may be located globally. Typical CMD application users are: local retail channel managers, branches, dealers, agents, relationship managers, financial advisors, brokers, contact centers and other marketers.

Both the PowerRPC portmapper and the PowerRPC runtime library were used by the CMD server. For one CMD server, there are many clients, which use the PowerRPC runtime software to communicate to the CMD server. A typical installation puts the CMD software (which includes PowerRPC runtime) on a web server, and allows users to download the install the software on their own computers.

In January 2008, Plaintiff filed the instant action, alleging seven counts of willful copyright infringement, including unauthorized copying of the PowerRPC SDK, creating unauthorized derivative work, copying and distributing the PowerRPC runtime software without server licenses, copying and distributing PowerRPC runtime software without client licenses. Plaintiff further alleges direct and/or indirect infringement by the three individuals.

Plaintiff disputes the legal contentions and factual allegations raised by Defendants in this

Joint Case Management Statement[2]. Plaintiff believes that the issues raised by Defendants here are being briefed in the parties' various pending motions, including Plaintiff's Motion for Disqualify Defense Counsel and the Defendants' Motion to Dismiss. In the *Netbula v. BindView* case, Judge Martin J. Jenkins ruled that defense counsel "mischaracterize" Netbula's complaint. Plaintiff believes that Defendants' standing argument has no merit and that similar arguments have been made in *Prather v. Neva Paperbacks Inc.*, 410 F.2d 698 (5th Cir. 1969), but the Court "[was] neither beguiled nor persuaded." *Id.* at 699.

## 2. DEFENDANTS' DESCRIPTION

### A. The Plaintiffs

Dongxiao Yue formed Netbula, LLC in July 1996 to market his "PowerRPC" software. Netbula is and has always been a manufacturer of software components licensed for use in other software products. Yue is the sole owner and only employee of Netbula. He is Netbula's President, Chief Officer of Sales and Marketing, and Vice President of Sales. He also responds to customers' technical support and licensing inquiries, albeit sometimes under the pseudonyms John Young or David King. All licenses at issue in the related cases had Netbula as the licensor. While Plaintiff now claims that he had "no prior business relationship with defendant," he previously acknowledged licensing his software to a Chordiant company in the U.K., and his inquiries to Chordiant for months, up until just before he filed suit, were consistently couched as inquiries about "license usage." Plaintiff raised the claim that no license existed with Chordiant only after months of requesting such license usage reports.

---

[2] In the *Netbula v. BindView* case (C06-0711-MJJ), Netbula filed a Rule 11 Sanctions Motion against Defense counsel for allegedly making false accusations against Yue in a Joint Case Management Statement. However, defense counsel claimed that it was a Joint Case Management Statement and Netbula did not dispute the false allegation. *C.f.* Docket No. 133 of the BindView case at p.19. Plaintiff believes that he has no obligation to review and dispute Defendants' numerous legal and factual contentions point by point in this Joint Case Management Statement, and Defense counsel has a duty to make competent inquiry on both facts and law.

### B.    Plaintiffs' software

All of the related cases involve allegations by Yue or Netbula that the various defendants' uses of Plaintiffs' software was unauthorized by or exceeded the scope of the defendants' licenses. All of the related cases involve the same type of software licensed and sold by Netbula, specifically software components that Yue adapted for use on Microsoft Windows computers.

Sun Microsystems developed and distributed software called Sun ONC RPC. RPC, which stands for "Remote Procedure Call," allows a program on a local computer to execute a command on a remote computer over a network. Sun originally developed ONC RPC for use on non-Windows computers. Plaintiffs' code is a derivative work of Sun ONC RPC. Yue claims that he began deriving Netbula ONC RPC and Netbula PowerRPC in 1994, and formed the Netbula LLC in 1996.

Netbula is one of a number of companies that facilitates the use of RPC on Windows computers.  (After Yue's belligerent demands in the Fall of 2007, Chordiant stopped using Netbula's software, replacing it with another available substitute.)  Customers generally use Plaintiffs' version of the RPC technology in two different manners. First, a customer can use Netbula's software developer kit ("SDK") to develop its own software applications with RPC functionality built in. Second, a customer would typically distribute its software applications with Plaintiffs' RPC "runtime" files, which enable the end user to make use of the RPC functionality.

### C.    Netbula's licensing model

Each of the related cases involves both a license for Netbula's SDK and a license for Netbula's runtime files.  These two types of licenses are distinct but are often purchased at the same time by a Netbula customer.  In Netbula's form agreements, the two types of licenses appear in the same document.  The SDK licenses allow computer programmers to use the SDK tools. The runtime licenses provide for a certain number of runtime distributions for a given price. For example, the license that StorageTek received from Netbula in 2000 set a license fee of $5,995 for StorageTek's distribution of up to 1,000 sets of runtime files. In essence, StorageTek's payment of the $5,995 runtime license fee compensated StorageTek for distribution of 1,000 copies of its software that contained Plaintiff's code.

1  Plaintiffs Yue and Netbula have contended that these licenses imposed additional
2  restrictions and that a customer's violation of those restrictions would constitute copyright
3  infringement. For example, Plaintiffs have argued that a licensee's use of a Netbula SDK on a
4  computer running an unauthorized operating system would constitute copyright infringement, not
5  merely a breach of a contractual term. Plaintiffs have also argued that a customer who has only
6  paid for 1,000 distributions of runtime files up front infringes by distributing a 1,001st copy.

7  The legal effect of these purported license restrictions is the heart of the various related
8  cases that Plaintiffs have filed in the Northern District of California. In general, Plaintiffs have
9  claimed that use exceeding alleged restrictions is copyright infringement. Defendants claim that
10 Plaintiff misreads the contractual restrictions, but that in any event, any failure to pay for uses
11 Defendants may have made would constitute at most a breach of contract, entitling Yue not to
12 millions in damages, but to another $7 per copy not yet paid for.

13 **D.    The related cases**

14 Yue and Netbula have filed five cases in this District alleging copyright infringement
15 against Netbula's licensees, all of which cases were related and handled by Judge Jenkins prior to
16 his resignation in April 2008. The first filing, *Netbula, LLC v. BindView Development*
17 *Corporation et al.*, Case Number C06-00711-MJJ (the "*BindView*" action) was followed by
18 *Netbula, LLC v. Greenwich Capital Markets, Inc.*, Case Number C06-07143. This was followed
19 by a third filing, *Netbula, LLC v. Storage Technology Corporation, Sun Microsystems, Inc., et al.*,
20 Case Number C06-07391-MJJ (the "*STK I*" action).

21 In January 2007, Netbula filed an administrative motion to relate the *BindView* action and
22 the *STK I* action on grounds that the following questions of law or fact, *inter alia*, were
23 "substantially similar or identical": "[w]hether Netbula's PowerRPC lacks originality to be
24 copyrightable," "[w]hether Netbula's PowerRPC copyright registration is invalid," the "per copy
25 license fee for Netbula's RPC runtime from year 2000 to 2006," and "[h]ow unlimited licenses are
26 treated for license fee determination." *See BindView* Docket No. 66, *at* 3.

27 The Court ordered the *BindView* and *STK I* cases related on February 27, 2007. On August
28 31, 2007, the Court granted summary judgment for the Defendants in the *BindView* action,

JOINT CASE MANAGEMENT CONFERENCE STATEMENT     -6-     CASE NO. C-08-00019-JW

including on claims for copyright infringement, fraud and breach of contract against *BindView,* its successor corporation Symantec, and its CEO.  On September 24, 2007, the parties filed a stipulation of dismissal with prejudice in the *BindView*.  On December 1, 2007, the Court ordered that the protective order in the *BindView* case be modified so that documents, discovery responses and testimony Netbula had designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY in *BindView* could be utilized in *STK I*, in order to avoid duplicative discovery.

Yue, proceeding pro se, filed the *STK II* action while a summary judgment motion on his copyright claims was pending in *STK I*.  *STK II* was premised on Yue's claim that he was entitled to pursue Netbula's copyrights in his individual capacity because, on September 26, 2007, he executed a legal instrument on behalf of Netbula that purported to assign to himself, as an individual, all of Netbula's copyright registrations in its Windows RPC software, as well as all past and future claims of infringement thereon. Yue also asserted that he allegedly owned copyright interests in early, pre-1996 versions of code that he asserts he did not transfer to Netbula, and which were not registered with the copyright office.[3]

On January 2, 2008, Yue filed his *Chordiant* action.  Yue alleged virtually the same copyright claims against *Chordiant* as he alleged in *STK II*, including claims for excessive copying of Netbula's SDK; excessive copying and granting to customers of site licenses for Netbula's runtime licenses; use of Netbula software on the wrong platform; individual liability against the Defendant's CEO, in-house counsel, and software managers; and that the license sold by Netbula applied only to an entity other than the named Defendants.

### E.    Proceedings in the Chordiant Action

As described in detail below, Chordiant has filed a motion to dismiss the Complaint as fundamentally defective as a matter of law and believes that until that motion is determined, there is no basis upon which to allow the commencement of discovery.

---

[3] Unlike *STK I* and *BindView*, which included common law claims for fraud and breach of contract in addition to copyright claims, *STK II* included only copyright claims. *STK II* also added the five Sun Individual Defendants, which include Sun's CEO, an in house general counsel, and lower level software development and procurement personnel.  Yue opposed relating *STK II* to *STK I*.  On December 14, 2007, Judge Jenkins ordered the *STK II* and *STK I* cases related.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    On January 15, 2008, Chordiant's counsel requested that Yue (appearing *pro se*) and
2 counsel for Netbula stipulate that the *Chordiant* case was related to the two *StorageTek* cases.
3 Yue declined. He contended that Chordiant's effort to relate this case to the other four was "judge
4 shopping," and cited his prior arguments that Judge Jenkins was biased against him. On
5 February 12, 2008, the Court nonetheless found *STK II* and *Chordiant* to be related.

6    All Defendants have moved to dismiss Yue's complaint in full because he has no standing
7 to sue over his company's software, or his alleged personal, unregistered copyrights. In addition,
8 as in *STK II,* Yue sued not only Chordiant, but also individual employees. Defendants Steven R.
9 Springsteel (Chordiant's CEO) and Derek P. Witte (Chordiant's general counsel) moved to
10 dismiss Yue's claims against them on grounds that Yue fails to state any claim or make any
11 factual allegation tying them to the alleged copyright infringement. Defendant Oliver Wilson (a
12 product manager) has filed a motion to dismiss for lack of personal jurisdiction, as he lives and
13 works in New Hampshire with no ties to California aside from the fact that his employer has a
14 California office.

15    As in *STK II*, Plaintiff has filed a Motion to Disqualify Opposing Counsel.

16    Defendants' motions to dismiss and Plaintiff's Motion to Disqualify Opposing Counsel
17 are all set to be heard on July 7, 2008.

18        **1.    Allegations of the complaint.**

19    Netbula sold a license to Chordiant in 2004 to distribute copies of Netbula's RPC runtime
20 files. Notwithstanding the license, Yue contends (as in the *STK I, STK II, BindView,* and
21 *Greenwich* cases) that Chordiant's distribution of its Marketing Director software infringed
22 copyrights, of which he identifies two in the Complaint. One is a copyright in PowerRPC
23 registered to Netbula in 2004 as both its "author" and "owner" (the "2k4 copyright"). Yue claims
24 that Netbula, by his signature, assigned this copyright to him on September 26, 2007, while he
25 was attempting to obtain a license usage report from Chordiant. The other copyright, which has
26 no registration, is allegedly for "earlier works created before July 24, 1996," comprising parts of
27 the PowerRPC software that Yue claims he wrote but never assigned to Netbula.

28    Although he attempts to sue here (and filed his *STK II* action) in his individual capacity,

JOINT CASE MANAGEMENT CONFERENCE STATEMENT     -8-     CASE NO. C-08-00019-JW

1   the Court has recognized that Netbula and Yue are really "one and the same." See *STK I* Docket

2   No. 139 [November 20, 2007 Transcript], at 10:25. Yue has alternatively identified himself as

3   Netbula's founder, its President, or its Chief Marketing and Sales Officer. Yue is the only owner,

4   officer and employee of Netbula, and has been personally involved in all aspects of his or

5   Netbula's copyright litigation.

### 2. Defendants contend that Yue has no standing.

7   In an attempt to fabricate standing to sue *pro se*, Yue purported to assign all of Netbula's

8   copyright registrations in its PowerRPC product—as well as all claims of infringement thereon—

9   to himself on September 26, 2007. Courts have repeatedly invalidated this stratagem to prevent

10  individuals from abusing the corporate form and pursuing corporate claims without counsel.[4]

11  Yue is not entitled to assign Netbula's claims to himself so that he can pursue corporate claims

12  without counsel. See *STK I* Docket No. 142 [Order denying Yue's request to disqualify the

13  Court], at 4 ("[T]he Court admonished Yue for his attempted intervention in a case in which he

14  was not authorized by law, nor granted permission, to represent, as a pro se litigant, the rights of

15  Netbula, a corporation.")

16  Apart from the assignment, Yue's claim for infringement relies on a copyright that has not

17  been registered—omitting the federal jurisdictional prerequisite for filing a copyright lawsuit.

18  Yue's lack of standing disposes of *all* claims against *all* Chordiant Defendants as a matter of law.

### 3. Defendants Contend that the Individual Defendants Must Be Dismissed.

20  The complaint includes seven separate "counts" of copyright infringement, each

21  purportedly "Against All Defendants" without distinction. The complaint lumps all Defendants

---

[4] At a November 20, 2007 hearing, Judge Jenkins denied Dr. Yue's motion to substitute himself as plaintiff for his corporation in the *STK I* action. *STK I* Docket No. 111. After Netbula's counsel acknowledged that one purpose of Dr. Yue's motion was to allow him to proceed *pro se*, Judge Jenkins noted that the purported September 26, 2007 "assignment does nothing to advance the conduct of this litigation since they're [Dr. Yue and Netbula] one in the same." *STK I* Docket No. 139, at 12:5-7, 12:13-20. The Court further noted:

> He wants to represent himself in this matter, and that's clear, and the record is abundantly clear. The inferences are extremely strong that the assignment was made in view toward being able to appear before the court and assert now the assigned interests in the copyright that is the subject of this litigation.

See *id.* at 16:21-17:1.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT                -9-                CASE NO. C-08-00019-JW

together as being culpable for direct, contributory, and vicarious liability on each of the seven counts. There is no factual basis tying Witte or Springsteel to the purported liability.

### a.  The Allegations Regarding Witte.

Yue observes that Mr. Witte is "the Vice President, General Counsel, and Secretary" of Chordiant. *Id.* ¶ 8. Beyond that allegation, the complaint's allegations against Witte arise solely out of Yue's communications with him about Chordiant's use of Netbula's software between August 2007 and January 2008.

### b.  The Allegations Regarding Springsteel.

The complaint observes that Springsteel "is the Chairman, President and CEO of CSI," but mentions nothing about his involvement in the alleged infringement. Rather, it alleges merely that, in October 2007, Yue had sent a single letter addressed to Springsteel "requesting the software usage information." The Complaint then seeks to hold Springsteel personally liable based on the conclusion that "Springsteel was informed about CSI's infringing actions, but did not stop the infringement."

### c.  The Allegations Regarding Wilson.

Wilson is a Chordiant employee who lives and works in New Hampshire. To answer some technical questions regarding RPC functionality, Wilson communicated with Netbula almost entirely by e-mail. Wilson never knew that Netbula or Yue were in or from California, or anywhere else for that matter. Since Wilson never called Netbula or Yue and his only correspondence was by e-mail, their location was immaterial. The remaining allegations are silent as to any connection of Wilson to California.

## PENDING MOTIONS.

In addition to Defendants' pending motions to dismiss, there are two motions pending from Yue: a Motion for Disqualification of Assigned Judge and a Motion to Disqualify Opposing Counsel (Fenwick & West).

### A.  Plaintiff

Plaintiff moved to disqualify defense counsel on several ethical grounds, including that a Fenwick partner served as Early Neutral in the *Netbula v. Distinct* dispute, and Yue provided

1  confidential information to that Fenwick partner. Defense counsel has indicated that they will file
2  supplemental brief to address Plaintiff's reply brief. Although Yue does not believe that defense
3  counsel can possibly refute their own emails and letters, Yue has requested Defense counsel to
4  provide him a copy of such supplemental brief. If the Court allows such supplemental brief by
5  defense counsel to be filed, Plaintiff requests that he be given the opportunity to file further
6  response.

7  Plaintiff further alleges that at the FRCP Rule 26(f) conference on April 24, 2008,
8  Defense counsel Jedediah Wakefield threatened to incur large amount of attorney's fees and seek
9  them from Yue, causing serious "personal financial stability" issues for Yue. Plaintiff
10 immediately warned Mr. Wakefield for making such statement which revealed his improper
11 motive.

### B. Defendants' position

13 After the reassignment of this case to the Honorable James Ware, Yue has renoticed only
14 the Motion to Disqualify Opposing Counsel, which is set to be heard on the same July 7, 2008
15 date as the motions to dismiss.

16 Defendants contend that Plaintiff's Reply Brief in support of its motion to disqualify
17 counsel raises a number of entirely new (and false) factual allegations as the basis to attempt to
18 challenge Fenwick & West's continued representation in the *Chordiant* and *StorageTek* cases.
19 Defendants intend to seek leave to file a supplemental brief to address points that Yue first raised
20 in his reply. Defendants dispute Yue's characterization of the conference on April 24, 2008.

### DISCOVERY.

22 Plaintiff has served its FRCP 26(a)(1) initial disclosures to Defendants. Plaintiff has
23 provided the list of witnesses, categories of documents and damages computation. Plaintiff has
24 collected various documents and is ready to produce them, including documents that show the
25 pricing of the PowerRPC products and competing RPC products in the market, copyright
26 ownership and related software code (as soon as an agreement on source code protection is
27 reached). Plaintiff proposed to devise a discovery plan with Defendants.

28 Pursuant to Federal Rule of Civil Procedure 26(a)(1)(C), Defendants object to initial

JOINT CASE MANAGEMENT CONFERENCE STATEMENT  -11-  CASE NO. C-08-00019-JW

1  disclosures at this time, and contend that discovery is premature and wasteful at this time because
2  of the pending motions to dismiss Plaintiff's claims in their entirety.

### A. Plaintiff's position on discovery

Plaintiff believes that discovery should commence immediately. Plaintiff believes that delay in discovery will unfairly prejudice him because of the irreparable harm he suffers due to alleged willful copyright infringement at a global scale. If a discovery plan cannot be agreed, Plaintiff will request limited expedited discovery, a Temporary Restraining Order to enjoin the alleged infringement and an Impoundment of the PowerRPC software Defendants copied or distributed.

Plaintiff requests the Court to order the parties to reach an agreement on a discovery plan and set a trial schedule.

### B. Defendants' position on discovery

If Yue lacks standing to bring the present action, there will be no need for discovery. *See Gettings v. Bldg. Laborers Local 310 Fringe Bens. Fund*, 349 F.3d 300, 304 (6th Cir. 2003). Alternatively, the dismissal of some Defendants or claims could greatly narrow the remaining issues, so Defendants believe it would be more appropriate to make initial disclosures, confer about disputed issues, and propound discovery after the Court rules on the motions to dismiss, possibly in early July 2008.

Moreover, if, as Plaintiff asserts, there were any conceivable basis for Defendants' counsel to be disqualified (there is not), then it would be inappropriate for discovery to be proceeding prior to that determination. The pendency of Yue's disqualification motion, too, weighs against any commencement of discovery at this time.

Defendants note that Plaintiff has argued that holding discovery until the motions to dismiss are decided would be prejudicial to him. However, Plaintiff has sought no provisional relief or otherwise indicated a need for expedited proceedings. In fact, Chordiant has advised Plaintiff that, after receiving his demands, it removed his components from the Chordiant product.

  **C.**  **Factual issues that Yue believes are disputed.**

- The number of programmers who used the PowerRPC SDK software to develop CSI products and the number of computers on which the SDK were installed;

- The types of operating systems CSI developed applications for using PowerRPC software;

- The names and description of CSI software products that CSI developed with PowerRPC;

- How PowerRPC was used in CSI's products;

- The identities of the third parties (such as CSI customers) which acquired PowerRPC software or its derivative software from CSI;

- The terms and conditions under which CSI allowed third parities to copy or distribute PowerRPC software or its derivative software;

- The ways CSI allowed others to distribute and copy PowerRPC software or its derivative work, such as web download and CD-ROM distribution, and whether there were any restrictions on the copying and distribution;

- The number of copies CSI has allowed others to copy or make use of the PowerRPC software in server applications;

- The number of copies CSI has allowed others to copy or make use of the PowerRPC software in client applications;

- Whether CSI knew it needed server and client runtime licenses for using or distributing PowerRPC software;

- CSI's general policy and control regarding software licenses;

- CSI's policy, control and mechanisms in monitoring its distribution of its products;

- Whether there are other persons who can be held liable for the infringement and additional recovery of damages;

- What's the functionality of these CSI applications and how they are used in CSI's customers' business;

- Whether CSI applications contain source code from or generated by PowerRPC software;

- Defendants' communications about PowerRPC;

- What actions CSI took after receiving Yue's initial inquiry;

- Whether and when CSI stopped using PowerRPC software;

- What CSI profits can be attributed directly to PowerRPC software;

JOINT CASE MANAGEMENT CONFERENCE STATEMENT   -13-   CASE NO. C-08-00019-JW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

- What CSI profits can be attributed indirectly to PowerRPC software;
- What interest rate should be applied to damages.

As noted above, Defendants contend that it is premature to confer about factual and legal issues until the Court rules on the pending motions to dismiss. But these are the factual issues Plaintiff sees.

### D.    Use of Discovery in *BindView* action in the *Chordiant* case.

If this case does proceed past motions to dismiss and into discovery, Defendants believe that, just as the Court ruled in *STK I*, the discovery that Plaintiff previously made in the *BindView* action will relevant in this action.

Specifically, Defendants contend that the same issues that initially prompted the *STK I* case to be related to *BindView*, and that prompted Judge Jenkins to hold that the *BindView* discovery must be made available in *STK I*, are in play here. This case also involves the originality and protectability of Netbula's code and the issues of who (as between Yue and Netbula) owns particular portions of that code. Further, this case, like *BindView* and *STK I*, involves the question of what the reasonable royalty or licensee fee is for uses of Netbula code, as that relates to the question of damages. Accordingly, if discovery ever commences, Defendants contend that Chordiant's counsel should be entitled to utilize materials obtained by lengthy discovery motions procedures in the *BindView* case (rather than requiring duplication of the multiple motions to compel in that action). And until such time, the Court should, as in *STK I*, hold the *BindView* protective order modified in order to allow Chordiant's counsel to retain the discovery materials from that action, subject to continuing confidentiality of those records.

Plaintiff opposes the use of *BindView* discovery about the *Netbula - Distinct* dispute, because Fenwick served as Early Neutral in the *Netbula -Distinct* case and the related discovery was presumably unethical. Otherwise, Plaintiff does not oppose the use of the other BindView discovery as long as such discovery is relevant and appropriate level of protection is ensured.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT        -14-        CASE NO. C-08-00019-JW

# JOINDER.

**A.  The additional parties which Yue intends to join and the intended time frame for such joinder:**

After it completes its initial round of discovery, Plaintiff expects to add third parties who received PowerRPC software from CSI as defendants and add additional defendants identified which Plaintiff believes are otherwise liable for copyright infringement. Defendants expect to oppose such efforts.

Dated: April 25, 2008                     FENWICK & WEST LLP

By:

_____/s/ Jedediah Wakefield_____

Jedediah Wakefield

Attorneys for the named Defendants:

CHORDIANT SOFTWARE, INC., DEREK P. WITTE, STEVEN R. SPRINGSTEEL, and OLIVER WILSON

Dated: April 25, 2008                     By:

_____/s/ Dongxiao Yue_____

Plaintiff DONGXIAO YUE

*In propria persona*

**ATTORNEY ATTESTATION**

Pursuant to General Order 45, I hereby attest that that concurrence in the filing of this document has been obtained from the signatories indicated by a "conformed" signature (/S/) within this e-filed document.

                                                    /s/ Jedediah Wakefield

                                                      Jedediah Wakefield