1   LAURENCE F. PULGRAM (CSB NO. 115163)
    *lpulgram@fenwick.com*
2   JEDEDIAH WAKEFIELD (CSB NO. 178058)
    *jwakefield@fenwick.com*
3   MARY E. MILIONIS (CSB NO. 233827)
    *mmilionis@fenwick.com*
4   LIWEN A. MAH (CSB NO. 239033)
    *lmah@fenwick.com*
5   FENWICK & WEST LLP
    555 California Street, 12th Floor
6   San Francisco, CA  94104
    Telephone: (415) 875-2300
7   Facsimile:  (415) 281-1350

8   Attorneys for Defendants
    CHORDIANT SOFTWARE, INC.,
9   STEVEN R. SPRINGSTEEL, and DEREK P. WITTE

10

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                      SAN JOSE DIVISION

14

15  NETBULA, LLC and DONGXIAO YUE,          Case No.  C-08-0019-JW

16              Plaintiffs,                 **DEFENDANTS' NOTICE OF MOTION,
                                            MOTION, AND MEMORANDUM OF
17         v.                               POINTS AND AUTHORITIES IN
                                            SUPPORT OF SUMMARY JUDGMENT
18                                          OR SUMMARY ADJUDICATION**
    CHORDIANT SOFTWARE, INC.,
19  STEVEN R. SPRINGSTEEL, and DEREK        Date:    April 6, 2009
    P. WITTE,                               Time:    9:00 a.m.
20                                          Dept:    Courtroom 8, 4th Floor
                Defendants.                 Judge:   The Honorable James Ware

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ............................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 1

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE FACTS .......................................................................... 3

    A.    The Parties ....................................................................................... 3

    B.    Netbula's ONC RPC Products ........................................................ 4

    C.    Chordiant's Use of ONC RPC in its Marketing Director Product ......................... 5

    D.    The 2000 License Purchase ............................................................ 5

    E.    The 2004 Upgrade Purchase .......................................................... 6

    F.    Netbula Treats Chordiant as its Customer/Licensee ...................... 8

    G.    Netbula's Requests for a "License Usage Report" from August through December, 2007 .................................................. 9

ARGUMENT ..................................................................................................... 10

I.    LEGAL STANDARDS FOR SUMMARY JUDGMENT ...................... 10

II.    CHORDIANT HOLDS A LICENSE FOR DEVELOPMENT AND RUNTIME DISTRIBUTION ...................................................... 10

    A.    Plaintiffs Granted Licenses to Prime Response and an Upgrade to Chordiant ................................................................... 11

    B.    Alternatively, as a Matter of Law, Plaintiffs' Conduct Established an Implied License to Chordiant ................................. 12

    C.    Plaintiffs are Estopped From Claiming Chordiant Infringed their Copyrights ............................................................................. 14

III.    PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING THAT THE SCOPE OF THE LICENSES TO CHORDIANT WAS EXCEEDED ............................................. 15

    A.    Plaintiffs Cannot Prove that the Parties Agreed on the Purported Restrictions ................................................................... 16

    B.    Plaintiffs Must Prove that Each Restriction was a Condition, Rather than a Covenant in Order to Prove Copyright Infringement ................................. 19

    C.    Plaintiffs Cannot Carry Their Burden To Demonstrate Breach of the Purported Conditions In the Distribution License .......................... 20

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**
**(continued)**

Page

1.      Platform Restrictions.................................................................................. 20

2.      Server Machine Restrictions ................................................................... 22

3.      Quantity and Prepayment.......................................................................... 24

D.      Plaintiffs Cannot Prove Use Outside the Scope of the SDK License .................. 24

1.      Platform Restrictions.................................................................................. 24

2.      Number of Users and Copies .................................................................. 25

CONCLUSION ............................................................................................................................ 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT

CASE NO. C-08-0019-JW

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 10

*Asset Mktg. Sys. Inc. v. Gagnon*,
542 F.3d 748 (9th Cir. 2008) ................................................................... 11, 14, 21

*Binder v. Aetna Life Ins. Co.*,
75 Cal. App. 4th 832 (1999) .................................................................................. 17

*Bourne v. Walt Disney Co.*,
68 F.3d 621 (2d Cir. 1995) ............................................................................... 11, 16

*Bustamante v. Intuit, Inc.*,
141 Cal. App. 4th 199 (2006) ................................................................................ 17

*Cairo, Inc. v. Crossmedia Servs. Inc.*,
2005 U.S. Dist. LEXIS 8450 (N.D. Cal. April 1, 2005) ........................................ 18

*DeForest Radio Tel. & Tel. Co. v. United States*,
273 U.S. 236 (1927) ............................................................................................... 12

*Effects Assoc., Inc. v. Cohen*,
908 F.2d 555 (9th Cir 1990) .......................................................................... passim

*Field v. Google Inc.*,
412 F. Supp. 2d 1106 (D. Nev. 2006) ............................................................ passim

*Graham v. James*,
144 F.3d 229 (2nd Cir. 1998) ................................................................................ 10

*Haddady Corp. v. Dean Witter Reynolds, Inc.*,
739 F. Supp. 1392 (C.D. Cal. 1990) ................................................................. 14, 15

*India Paint and Lacquer Co. v. United Steel Prds. Corp.*,
123 Cal. App. 2d 597 (1954) ................................................................................. 18

*Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*,
2009 U.S. Dist. LEXIS 9875 (N.D. Cal. Feb. 10, 2009) ........................................ 13

*Jacobsen v. Katzner*,
535 F. 3d 1373 (Fed. Cir. 2008) ............................................................................ 20

*Keane Dealer Servs., Inc. v. Harts*,
968 F. Supp. 944 (S.D.N.Y. 1997) .................................................................... 13, 15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................................... 10

*Meisner Brem Corp. v. Mitchell*,
313 F. Supp. 2d 13 (D.N.H. 2004) ............................................................ 13, 14, 16

*Netbula v. Bindview*,
516 F. Supp. 3d 1137 (N.D. Cal. 2007) ......................................................... passim

*Netbula v. Storage Technology Corp.*,
2008 U.S. District LEXIS 4119 (N.D. Cal. Jan. 18, 2008) ............................. passim

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-iii-

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Parker v. Yahoo!, Inc.*,
2008 U.S. Dist. LEXIS 74512 (E.D. Pa. Sept. 26, 2008) ................................... 13, 14

*ProCD, Inc. v. Zeidenbert*,
86 F.3d 1447 (7th Cir. 1996)......................................................................... 17

*Quinn v. City of Detroit*,
23 F. Supp. 2d 741 (E.D. Mich. Sept. 29, 1998)............................................... 14

*Roley v. New World Pictures*,
19 F.3d 479 (9th Cir. 1994)............................................................................ 22

*Softman Prods. Co. v. Adobe Sys. Inc.*,
171 F. Supp. 2d 1075 (C.D. Cal. 2001) ........................................................... 17

*Specht v. Netscape Comm's Corp.*,
150 F. Supp. 2d 585 (S.D.N.Y. 2001)......................................................... 17, 18

*Specht v. Netscape Comm's Corp.*,
306 F.3d 17 (2d Cir. 2002)......................................................................... 17, 18

*Sun Microsystems, Inc. v. Microsoft Corp.*,
188 F.3d 1115 (9th Cir. 1999)............................................................. 10, 16, 19

*Sun Microsystems, Inc. v. Microsoft Corp.*,
2000 U.S. Dist. LEXIS 20222 (N.D. Cal. May 8, 2000) ..................................... 19

*Tanenbaum Textile Co. v. Schlanger*,
40 N.E.2d 225 (N.Y. 1942)............................................................................. 18

*Tempo Music, Inc. v. Myers*,
407 F.2d 503 (4th Cir. 1969).......................................................................... 14

*Vintage Verendah Inc. v. Mastercraft Int'l. Inc.*,
2006 U.S. Dist. LEXIS 91718 (E.D. Ark. Dec. 15, 2006) ................................... 16

*Watermark Publrs. v. High Tech. Sys.*,
1997 U.S. Dist. LEXIS 22512 (S.D. Cal. June 18, 1997) .................................... 14

*Wood v. Santa Barbara Chamber of Commerce, Inc.*,
507 F. Supp. 1128 (D. Nev. 1980) .................................................................. 22

**<u>STATUTES</u>**

17 U.S.C. § 507.............................................................................................. 22

Fed. R. Civ. P. 5 ............................................................................................... 1

Fed. R. Civ. P. 56(c)........................................................................................ 10

**<u>OTHER AUTHORITIES</u>**

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 10.03[A] (1989).................. 13

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT

CASE NO. C-08-0019-JW

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT, on April 6, 2009, in courtroom 8 of the United States District Court, Northern District of California, San Jose Division, located at 280 South 1st Street, San Jose, California, at 9:00 a.m. or as soon thereafter as this matter may be heard, Defendants Chordiant Software, Inc. ("Chordiant"), Steven R. Springsteel ("Springsteel"), and Derek P. Witte ("Witte") (collectively, "Defendants") will and hereby do move pursuant to Fed. R. Civ. P. 56 for summary judgment on Plaintiffs Netbula, LLC's and Dongxiao Yue's (collectively, "Plaintiffs") claims for direct and vicarious copyright infringement.  Alternatively, Defendants seek summary adjudication of the issues that (1) Chordiant has an actual or implied development and distribution license to Plaintiffs' ONC RPC software, and/or Plaintiffs are estopped to deny such license; (2) Plaintiffs' template license forms were not accepted by and do not bind Chordiant; (3) Chordiant has not exceeded the scope of its license, nor violated any condition in its license, with respect to (a) distribution on platforms, (b) distribution for servers, (c) payment for licenses, (d) development on platforms, and/or (e) number of developers or copies used in development.

This motion is based upon this Notice and Memorandum of Points and Authorities, the Declaration of Mary E. Milionis ("Milionis Dec."), the Declaration of Oliver Wilson ("Wilson Dec."),  the records on file in this action, and on such oral argument as the Court may allow.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This lawsuit is the latest in a series by Plaintiffs Donxiao Yue and his company Netbula LLC ("Netbula"), seeking to convert relationships with Netbula's licensees into litigations over copyright infringement.  Plaintiffs claim that Defendants Chordiant Software, Inc. ("Chordiant" or "Chordiant Software"), Derek P. Witte, and Steven R. Springsteel infringed when Chordiant used Netbula's software development tools for precisely the purpose for which Plaintiffs licensed them: to develop and distribute software.  The facts are undisputed that Netbula twice shipped CDs that described on their face Netbula's grant of development and distribution licenses, for which it was paid both times the price of nearly $7000.  The facts are further undisputed that

-1-

1   Plaintiffs not only repeatedly acquiesced in, but affirmatively assisted with the uses that

2   Chordiant made through late 2007.

3       In the "gotcha" litigation strategy that has become their business model, however,

4   Plaintiffs now want more.  After years of dealing with Chordiant as his customer and well into

5   pursuit of "license usage reports" from Chordiant—Dr. Yue noticed that a purchase order came

6   from, and was invoiced to, Chordiant's European office and subsidiary, Chordiant Software

7   International, Ltd. ("Chordiant International").  Dr. Yue acknowledges that not other documents

8   in his files mentions the subsidiary, and that he dealt for years directly with Chordiant, the parent.

9   But Plaintiffs have now asserted that Chordiant is no longer their licensee, and instead is an

10  infringer.  This after-the-fact gambit is both foreclosed by the implied license doctrine and

11  estopped by Plaintiffs' years of acquiescence.

12      Plaintiffs alternatively assert that purported restrictions in Chordiant's licenses limit its

13  uses of Netbula's works.  As in Plaintiffs' prior lawsuits,[1] these claims fail for two reasons.

14      First, because there is no signed or "clicked-through" license agreement, Plaintiffs cannot

15  prove Chordiant's agreement to the restrictions they assert—a burden that falls squarely on

16  Plaintiffs once it is established that licenses were in fact granted.  As in *Netbula v. Bindview*, 516

17  F. Supp. 3d 1137, 1152 (N.D. Cal. 2007) ("*Bindview*"), Plaintiffs cannot simply impose the terms

18  they *wish* had been agreed upon, absent any assent by Chordiant.

19      Second, even if the purported restrictions existed, as a matter of law they would constitute

20  merely covenants, and not conditions, to the licenses at issue.  Here, as in *Netbula v. Storage

21  Technology Corp.*, 2008 U.S. District LEXIS 4119, *15-24 (N.D. Cal. Jan. 18, 2008) ("*STC*") an

22  allegation of breach of a license covenant does not give rise to a claim of copyright infringement,

23  but at most a claim for breach of contract.  Moreover, in several instances, there is no evidence

24  the purported restriction was violated.

25      Accordingly, summary judgment should be granted against the Plaintiffs' copyright

26

27  _____
    [1] Dr. Yue and Netbula have filed some five separate actions alleging that Netbula's licensees,
28  their customers, and their officers and directors were copyright infringers.  On each case that has
    reached adjudication on the merits, summary judgment has been entered on the license defense.

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT                                CASE NO. C-08-0019-JW

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   claims.  In the alternative, the Court, at a minimum, should enter summary adjudication finding

2   that Netbula actually or impliedly granted a license to Chordiant Software and dispose  of

3   Plaintiffs' asserted restrictions, as to which no factual issue exists.

4   **STATEMENT OF THE FACTS**

5       **A.**    <u>**The Parties**</u>

6         Netbula, LLC was created by Dongxiao Yue, its President and sole employee, to market

7   software development tools that he wrote.  Dkt. No. 91, Second Amended Complaint ("SAC") ¶

8   11; Milionis Dec. Ex. 48 at 69:3-70:14.  Although Netbula regularly communicates through the

9   names of "Dave King" (who provides customer support) and "John Young" (who is responsible

10  for sales), both names are fictional:  Dr. Yue himself sends emails using each of these fake names

11  to customers, including Chordiant, without identifying himself as the author. Depo. 39:2-40:14,

12  46:11-47:5; Milionis Dec. Ex. 48 at 52:2-54:20.[2]  Dr. Yue claims that he owns copyrights in

13  certain unidentified parts of the software that Netbula distributes by virtue of work that he

14  performed prior to setting up Netbula in 1996.  Dr. Yue asserts that he licensed his work to

15  Netbula for distribution.  SAC ¶ 15, Ex. C; Milionis Dec. Ex. 48 at 79:14-80:12.

16        Chordiant is a publicly held company that develops customer experience software, with its

17  headquarters in Sunnyvale.  It has offices in New Hampshire and its European Headquarters in

18  England.  Wilson Dec. ¶ 2.  The individual Defendants accused of vicarious liability are Steven

19  Springsteel, Chordiant's CEO, and Derek Witte, its former general counsel.  SAC ¶¶ 5-6.

20        One of Chordiant's products is called Chordiant Marketing Director ("CMD").  This

21  software was originally developed in the early 2000s by Prime Response, Inc.  Wilson Dec. ¶¶ 3-

22  4.  In 2001, Chordiant publicly announced and consummated its purchase of Prime Response, Inc.

23  through a reverse triangular merger.  *Id.* ¶ 4, Exs. A-B.  Prior to the merger, Prime Response, Inc.

24  had an office in the United Kingdom, operating under the name of Prime Response, Ltd. *Id.* ¶ 5.

25  After the merger, Chordiant changed the name of the UK office to "Chordiant Software

26

27  [2] Unless otherwise noted, references to "Ex. " are Exhibits to the Netbula 30(b)(6) Deposition,
    filed with the Milionis Declaration, and they retain the numbering from the deposition.  Milionis
28  Dec. ¶ 2.

-3-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  International, Ltd." The UK office functions as the European headquarters for Chordiant to this

2  day. Chordiant moved UK staff responsible for CMD to the New Hampshire in 2004. *Id.*

3  **B.**    **Netbula's ONC RPC Products**

4  Sun Microsystems originally invented a standard called "ONC RPC" to allow one

5  computer to give instructions remotely to another over Unix/Linux based operating systems.

6  Milionis Dec. Ex. 48 at 63:1-12. Netbula's software at issue in this action is a "port" (or

7  conversion) of the ONC RPC standard to the Microsoft Windows 32 bit (Win32) operating

8  systems. Depo. 239:11-24,[3] Ex. 29. Win32 platforms include Windows NT, 95, 98, 2000 ("2k"),

9  XP, Server 2003, and Vista. Depo. 239:25-240:10; Wilson Dec. ¶ 7. Netbula's version of ONC

10  RPC (hereafter "ONC RPC") facilitates remote instructions between "client" computers and

11  "server" computers using Win32 operating systems. Ex. 30

12  Netbula's ONC RPC includes two parts. First, Netbula licenses a Software Development

13  Kit ("SDK") with tools including a file called "rpcgen.exe" that assists a licensee's programmers

14  in creating applications that use the ONC RPC standard. SAC ¶16. Netbula grants licenses for

15  its licensees to use the SDK for a specified number of developers. *Id.* ¶ 17; Exs. 21, 26.

16  Second, Netbula includes in the SDK, and licenses for redistribution, certain "runtime"

17  files that must be installed by end users with the licensee's application. SAC ¶¶ 16, 22. These

18  components include a "portmapper" that runs on the server side of client/server communications

19  Depo. 21:24-22:1. They also include "pwrpc32.dll," a dynamic link library file for Win32

20  platforms that contains a library of functions and other information that can be accessed by a

21  Windows application as needed for its ONC RPC communications. Wilson Dec. ¶ 10.

22  While Plaintiffs' software saves its licensees the time of writing code themselves, there

23  are numerous alternatives available. Indeed, once Plaintiffs started threatening, Chordiant simply

24  substituted in a free alternative to replace the Netbula code. *Id.* ¶ 11.

25

26

27  [3] All references to "Depo. [page:line]" are to the 30(b)(6) deposition of Netbula LLC. Portions of that deposition not designated as confidential are attached as Exhibit 46 to the Milionis Declaration. Those portions designated "Confidential" or "Confidential – Attorneys' Eyes Only" are attached as Exhibit 47 to the Milionis Declaration.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-4-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### C.   Chordiant's Use of ONC RPC in its Marketing Director Product

Prior to replacing the Netbula code with freeware, Chordiant used ONC RPC for one specialized software product—CMD, which is a marketing campaign management application designed to plan and execute sophisticated campaigns. *Id. ¶ 12.* CMD runs on a centralized server, either Windows or Unix, which performs the computing operations, and which is remotely accessed by "client" applications, usually a desktop PC. *Id.* ¶. Chordiant used Netbula's runtime files in both clients and servers running Win32 platforms.

### D.   The 2000 License Purchase

It is undisputed that, in January 2000, Netbula sold an SDK License for one developer, and a Distribution License for 1000 copies of runtime licenses, to Prime Response, Ltd. (the "2000 License"). Depo. 104:18-108:15; Ex. 11. The label of the CD Netbula shipped states:

> Licensed to:
> Prime Response UK          Netbula ONC RPC For Win32
> One Developer              Development Toolkit
> 1000 mach runtime

Ex. 21. Prime Response paid Netbula $895 for the development license plus $5995 for the first 1000 runtime copies for distribution, for a total of $6890. Ex. 11.

Although the SAC (¶ 18) contends that "at all relevant times …. Plaintiffs have required each purchaser to also buy a separate server license or client license," Netbula conceded at deposition that the 1000 runtime licenses it sold in 2000 authorized distributions for *both* client or server uses. Depo. 125:21-127:7; *see also* Ex. 11 (Netbula invoice referring to "1000 machines").

One of over 100 files included in the CD sent in 2000 was a form template for a license agreement. Exs. 15, 45. There was no prompt to bring that template to a user's attention; no requirement that the user "click through" or agree to it; the template included blanks not filled in; and it stated that the parties would "BY SIGNING BELOW, INDICATE THEIR ACCEPTANCE OF THE FOLLOWING AGREEMENT"—but neither party did. Depo. 332:2-12; Wilson Dec. ¶ 16; Ex. 15. There is no evidence that Chordiant or Prime Response accepted—or even opened—the template.

Consistent with its license, Prime Response (and Chordiant after the 2001 merger)

-5-

Fenwick & West LLP
Attorneys At Law
San Francisco

1   proceeded to develop CMD and to distribute the runtime files in client and server software.

2   Chordiant communicated openly about this work, and Netbula supported it.  For example, in

3   2002, Chordiant's software engineer, Toye Akande, approached Netbula for support, asking

4   specific questions about how to use Netbula's SDK to modify *server side* code.  Ex. 44.  "Dave

5   King" of Netbula (actually, Dr. Yue), answered with specific advice about server usage, including

6   "manual editing of the [SDK-] generated server code."  Ex. 44; Depo. 323:4-326:3.

7          **E.      The 2004 Upgrade Purchase**

8          In February, 2004, Chordiant again emailed Netbula about a problem.  Wilson Dec. ¶ 18.

9   Mr. Akande, identifying himself three separate times as a Software Engineer at Chordiant

10  Software, Inc., inquired whether Netbula had an updated version of the .dll. Ex. 7.  "Dave King"

11  (Dr. Yue) emailed a demo of the updated pwrpc32.dll.  That updated version solved Chordiant's

12  issue, and in March, Mr. Akande requested to know "how much [an update of the software] might

13  cost under a similar licensing agreement as we had with the initial purchase."  *Id.*  When "Dave

14  King" could not find the name "Chordiant" in Netbula's records, Mr. Akande explained that "the

15  invoice would have been raised under the previous company name of Prime Response Ltd."  *Id.*

16         "Dave King" wrote back saying that he "found the invoice," that it did not include a

17  service contract entitling the licensee to an upgrade, and that "our standard upgrade contract is for

18  customers to pay an annual fee equals 20% of the license fees."  *Id.*  "Dave King" then described

19  the 2000 License to Akande as follows:  "Chordiant pruchase [sic] 1000 client runtime in January

20  2000."  *Id.*  The insertion of the word "client" made this statement incomplete; as is undisputed,

21  and as the 2000 invoice in Dr. Yue's hands at the time reflected (Ex. 11), the 2000 License had

22  been for "1000 machines," not limited to clients in any way.  *See also* Depo. 196:9-20.  "Dave

23  King" advised that "to upgrade the current version of the SDK and runtime (supports

24  2k/Xp/server 2003), Chordiant needs to make back payments for the last 4 years, which is 80% of

25  the original license fees ($6890)."  Ex. 7.  The only "Chordiant" identified to Netbula in the

26  emails, and the one to whom Netbula made the upgrade offer, was Mr. Akande's employer,

27  Chordiant Software, Inc.  Netbula had never even heard of Chordiant International when it made

28  the upgrade offer.  *See* Depo. 195:6-10.

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT                                        CASE NO. C-08-0019-JW

Chordiant decided to accept the offer, purchasing the upgrade and back support.  At

Netbula's request, Chordiant's officer manager at Mr. Akande's office in England submitted a

purchase order (the "2004 PO").  Ex. 23; Wilson Dec. ¶ 20.  The PO repeated the email

description of the upgrade that "Dave King" had written, listing "1000" "client runtime licenses

(support NT/2K/Xp/Server2003)."  Ex. 23.  It also ordered "standard support/maintenance

contract (including back payment for the last 4 years)" and "upgrade to the current version of the

SDK. "  *Id.*  Chordiant's 2004 PO specified an incorrect price—instead of $5,512 (the amount due

according to "Dave King's" offer), the PO stated $6980 (the full price of the 2000 License,

$6890, with a transposition).  The 2004 PO was sent under a large "Chordiant" nameplate, with

Chordiant's trademarked "C" logo, on a form bearing the address and other information for

Chordiant's European headquarters, Chordiant International.  *Id.*

On April 24, 2004, "John Young" (actually, Dr. Yue) sent back an invoice to the same

address.  Exs. 27, 28; Depo. 207:13- 212:25.  It varied from the 2004 PO in material respects

(although it retained the mistaken, overstated price, which Dr. Yue testified he did not notice

when he prepared the invoice).  *Id.*  The invoice, treating Chordiant's purchase as an upgrade of

the 2000 License, described a single order of "1000 ONC RPC WIN32 Client runtime upgrade

(NT/2K/XP/Server 2003)" and "ONC RPC Win32 SDK Upgrade."  Ex. 24.  Thus, the invoice

added the word "upgrade" and the descriptor "WIN32" and removed the word "support" before

the list of platforms supported.

Along with the invoice, "John Young" emailed a copy of the SDK upgrade to Mr. Akande

at the Chordiant.com address that Mr. Akande had previously identified as Chordiant Software,

Inc.  Ex. 27.  Dr. Yue also sent a CD containing the upgraded software (the "Upgrade"), labeled:

|  | ONC RPC |
|  | Software |
| Licensee Chordiant Software | Development |
| 1 Developer  1000 Runtime (s10303) | Toolkit (Win32) |

Ex. 26.  The 2004 CD included, as one of dozens of files, a different blank template licensing

agreement.  Wilson Dec. ¶ 23; Ex. 25 (file list of the 2004 CD); Ex. 18 (printout of template).

There was no requirement that the user "click through" to agree to that template; it included

Fenwick & West LLP
Attorneys At Law
San Francisco

1   numerous blanks (including for the name of the licensee, units, and prices); and it stated at the top

2   that "BY SIGNING BELOW, THE PARTIES INDICATE THEIR ACCEPTANCE OF THE

3   FOLLOWING AGREEMENT BETWEEN ____ ("YOUR COMPANY") AND NETBULA

4   LLC." The 2004 CD provided an optional automatic installer file which, if used, *could* request

5   the user to click through the blank template. However, the "Installation and use tips" Dr. Yue

6   wrote gave instructions for manual installation of the files *without* using the installer program, in

7   which case the license template was never presented and click through was not requested. Ex. 25;

8   Wilson Dec. ¶ 24. There is no evidence that Chordiant ever signed or even saw the 2004 template.

9              **F.    Netbula Treats Chordiant as its Customer/Licensee**

10           From April 2004 through December 2007, Plaintiffs dealt consistently with Chordiant,

11  and its representatives identifying themselves as employees of "Chordiant Software, Inc." without

12  any objection, and without any further reference to Chordiant International at any time. For

13  example, in June, 2004, Akande—identifying his company as "Chordiant Software Inc."—wrote

14  that "[w]e have now installed the latest version of Netbula ONC-ROC [sic] kit" and asked a

15  technical question. Ex. 32. Dr. Yue (posing as "Dave King") responded without missing a beat,

16  never suggesting Chordiant lacked a license for that installation. *Id.* In August, 2005, Netbula

17  sent a marketing email to Oliver Wilson, a Chordiant employee in New Hampshire, addressing

18  Wilson as a "Netbula ONC RPC and PowerRPC user." Ex. 33.

19           In April 2007 Mr. Wilson contacted Netbula with another question, identifying himself as

20  Program Manager for the Marketing Director product at Chordiant Software, Inc., with a U.S.

21  area code, and links to the chordiant.com website. Wilson Dec. ¶ 28; Ex. 34. Wilson's email,

22  entitled "ONC RPC – Vista" stated that "Chordiant software [sic] purchased" a license and had

23  been using Netbula's product for years. *Id.* It inquired about a problem getting CMD to work on

24  the Vista platform. *Id.* Rather than saying that Chordiant had no license, or that it had no right to

25  use ONC RPC on Vista, "John Young" (Dr. Yue) referred the matter to "Dave King" (also Dr.

26  Yue), who responded half an hour later by attempting to analyze the Vista problem, and later

27  suggested that Chordiant download the demo version of the software from Netbula's website. *Id.*

28           Throughout this time, the links to Chordiant's website included in Chordiant's emails

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT                                  CASE NO. C-08-0019-JW

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

reflected that Chordiant International (which had no website of its own) served as the European

Headquarters for Chordiant. Wilson Dec. ¶ 30, Ex. C.

### G.   Netbula's Requests for a "License Usage Report" from August through December, 2007

In August, 2007, Dr. Yue—now using his own name—emailed Chordiant re: "License

Usage Report." Ex. 37.  Dr. Yue initially addressed his inquiry to Mr. Wilson, picking up the

email string about Vista that, as always, identified Mr. Wilson as working for Chordiant

Software, Inc. *Id.* at NC144; Wilson Dec. ¶ 31.  Dr. Yue did not assert that Chordiant Software,

Inc. lacked a license. *Id.*  Rather, in correspondence with Mr. Wilson, and then with general

counsel Derek Witte (who also identified his company as Chordiant Software, Inc.), Dr. Yue

consistently recognized that Chordiant had a license, and asked for a report on "license usage,"

probing for information about the potential violation of "restrictions" he asserted Chordiant's

license contained.  Exs. 36-37, 41-43.  Dr. Yue referred to restrictions in "the original license

Chordiant purchased" (Ex. 43), reiterating the understanding that Chordiant had a license.  He

even wrote a letter to the CEO of Chordiant Software, Inc. specifically *defining* "Chordiant" to

mean Chordiant Software, Inc. and demanding information about "whether Chordiant

developed/distributed applications on unlicensed operating systems"—a request implicitly

recognizing Chordiant had a license on certain operating systems.  Ex. 38.

When Dr. Yue continued with onerous demands for information from Chordiant's general

counsel, Mr. Witte pressed Dr. Yue to provide documentation of the terms of any agreement that

required the information he was requesting.  Ex. 41.  On October 5, 2007, Dr. Yue responded

"My question to Chordiant is this: did Chordiant agree to and abide by Netbula's license terms?"

*Id.*  Even during these interchanges, Dr. Yue proceeded on the premise that Chordiant Software,

Inc. was the licensed party—even submitting the purchase order emanating from Chordiant

International as evidence of *Chordiant's* agreement. *Id.* at NC118.  Indeed, Dr. Yue admits that

he never made any distinction between Chordiant and Chordiant International until at least

October, 2007; he consistently treated Chordiant as the licensed party.  Depo. 305:12-306:4.

On December 21, 2007, Chordiant delivered to Dr. Yue its report on runtime license

-9-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   usage, which totaled 953 units.  Ex. 41.  That same day, Dr. Yue claimed for the first time that

2   Chordiant had committed copyright infringement.  Ex. 42.  Only on January 2, 2008, *the day he*

3   *filed this lawsuit*, did Dr. Yue first articulate his position that Chordiant had never had a license,

4   that "I never heard of [Chordiant Software, Inc.] until recently" and that his license was with a

5   different company.  Ex. 43; Milionis Dec. Ex. ¶ 34, Ex. 49 (dated version of Ex. 43).

6                                              **ARGUMENT**

7   **I.      LEGAL STANDARDS FOR SUMMARY JUDGMENT**

8          Summary judgment is appropriate where there is "no genuine issue as to any material fact

9   and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue

10  is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could

11  find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the

12  suit under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

13  Once the movant meets its initial burden of showing there is no genuine issue of material fact, the

14  non-movant has the burden of producing competent evidence and cannot rely on mere allegations

15  or denials in the pleadings.  *Id.* at 247-48, 256-57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

16  *Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "Where the record taken as a whole could not lead a

17  rational trier of fact to find for the non moving party, there is no 'genuine issue for trial.'"  *Id.* at

18  587.

19  **II.     CHORDIANT HOLDS A LICENSE FOR DEVELOPMENT AND RUNTIME**
            **DISTRIBUTION**
20

21         When "a copyright owner . . . grants a nonexclusive license to use his copyrighted

22  material [he] waives his right to sue the licensee for copyright infringement and can sue only for

23  breach of contract."  *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1121-22

24  (9th Cir. 1999) (internal quotations and citations omitted) (vacating preliminary injunction); *see*

25  *also*, *Graham v. James*, 144 F.3d 229 (2nd Cir. 1998) (same).  A nonexclusive license, in turn,

26  may be granted "expressly or impliedly through conduct."  *Field v. Google Inc.*, 412 F. Supp. 2d

27  1106, 1115 (D. Nev. 2006); *Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir 1990).

28         A licensor can bring an action for copyright infringement only if a license is limited in

                                                   -10-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   scope and the licensee acts outside the scope. *See Sun,* 188 F.3d at 1121-22.  Where the existence

2   of a license is undisputed, the burden of proof shifts to the copyright holder to prove, with

3   admissible evidence, that the scope of the license was exceeded. *Bindview,* 516 F. Supp. 2d at

4   1150; *see also Bourne v. Walt Disney Co.,* 68 F.3d 621, 631 (2d Cir. 1995).  Courts in the Ninth

5   Circuit (and elsewhere) regularly grant summary judgment in favor of a licensee where the

6   plaintiff has failed to prove enforceable limitations on the license's scope that have been

7   exceeded.  *See, e.g., Asset Mktg. Sys. Inc. v. Gagnon,* 542 F.3d 748 (9th Cir. 2008) (granting

8   summary judgment upon finding of an implied license); *Effects,* 908 F.2d 555 (same); *Field,* 412

9   F. Supp. 2d 1106 (same).

10          **A.          Plaintiffs Granted Licenses to Prime Response and an Upgrade to Chordiant**

11          It is undisputed here that Plaintiffs granted licenses to Prime Response Ltd. and at least

12   some Chordiant entity.  *See* Depo. 105:22-106:21, 109:14-110:16 (acknowledging existence of

13   both licenses).  The disputed issue is whether the Chordiant license included Chordiant Software,

14   Inc.—the entity that communicated with Netbula in all instances from 2004 to 2007—or only

15   Chordiant International, the address on the purchase order.  Because the existence of the license is

16   undisputed, Plaintiffs bear the burden of proving that the scope of the license was exceeded.

17   *Bindview,* 516 F. Supp. 2d at 1150.  The undisputed facts show Chordiant (the parent) is within

18   the license granted.

19          The record is replete with evidence that Plaintiffs twice granted Defendants licenses.  The

20   2000 License to Prime Response is confirmed on the face of the 2000 CD containing the ONC

21   RPC software that Netbula sent to Prime Response.  Right below the notice of Netbula's

22   copyright appears: "Licensed to Prime Resposne [sic] UK," "One Developer" and "1000 mach

23   runtime."  Ex. 21.  Dr. Yue acknowledged that the CD labels, which he wrote, "should usually

24   contain a brief description of what the customer have [sic] purchased in terms of license grant."

25   Depo. 159:11-160:1.  Four years later, Dr. Yue also confirmed that "Chordiant pruchase [sic]

26   1000 client runtime in January 2000" in response to Mr. Akande's request for an upgrade.  Ex. 7.

27          Similarly, Plaintiffs cannot retroactively reverse their grant of an Upgrade of the SDK and

28   runtime distribution licenses to Chordiant in 2004.  The face of the 2004 CD containing the ONC

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-11-

1  RPC software declares "Chordiant Software" to be the "Licensee" of "1 Developer" and "1000

2  Runtime (s 10303)." Ex. 26. The e-mail exchange offering the 2004 Upgrade occurred at a time

3  Netbula had ***never even heard of Chordiant International***. Depo. 305:19-306:4. Netbula

4  offered the upgrade to Mr. Akande as an employee of Chordiant Software, Inc.—the only

5  Chordiant he had ever heard of—stating that "to upgrade the current version of the SDK and

6  runtime . . . Chordiant needs to make back payments for the last 4 years." Ex. 7. Netbula labeled

7  the software it delivered as "Chordiant Software" without reference to Chordiant International.

8  Ex. 26. Netbula admits that it had no internal documents describing Chordiant International prior

9  to August 2007—all referred only to Chordiant—with the exception of the 2004 PO and resulting

10  invoice. Depo. 257:19-258:5. That purchase order did not convert a license negotiated by and

11  offered to Chordiant into a license limited to Chordiant's *subsidiary*.

12      To the contrary, Plaintiffs never challenged Chordiant's right to use or distribute ONC

13  RPC and instead supported Chordiant (the parent), *as the licensee*. *See* Ex. 32 (exchange between

14  Mr. Akande and "Dave King" regarding ONC RPC compliance with standards); Ex. 7 (exchange

15  between Mr. Akande and "Dave King" assisting in cure of problems with outdated .dll files); Ex.

16  34 (exchange between Mr. Wilson and "Dave King" regarding implementation on Vista); Ex. 38

17  (letter recognizing Mr. Springsteel as CEO of "Chordiant Software, Inc.," and questioning

18  whether Chordiant distributed applications on "unlicensed operating systems"). Plaintiffs can

19  provide no evidence to establish that the acknowledged license was not granted to Chordiant, or

20  even if Chordiant International were the nominal licensee, that the license *excluded* distribution

21  throughout Chordiant. As in *Bindview*, Plaintiffs can supply no license agreement, and hence, no

22  substantiation that the license excluded the principal with whom Netbula communicated.

23      **B.**    **Alternatively, as a Matter of Law, Plaintiffs' Conduct Established an Implied License to Chordiant**

24

25      Even if Chordiant were not within the scope of the express license, Plaintiffs' actions gave

26  Chordiant at least an implied license. Implied licenses are granted "where the copyright holder

27  engages in 'conduct from which [the] other [party] may properly infer that the owner consents to

28  his use.'" *Field*, 412 F. Supp. 2d at 1116, *quoting DeForest Radio Tel. & Tel. Co. v. United*

-12-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   *States,* 273 U.S. 236, 241 (1927); *see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on*

2   *Copyright*, § 10.03[A] (1989).  That apparent consent need not be express and may be manifested

3   in the form of "mere permission or lack of objection."  *Keane Dealer Servs., Inc. v. Harts*, 968 F.

4   Supp. 944, 947 (S.D.N.Y. 1997) (summary judgment granted on implied license and estoppel

5   defenses).  Intent is the keystone of this defense, but in determining what Plaintiffs' intentions

6   were, "the Court does not focus on the subjective intent of the putative licensor, but rather makes

7   an ***objective inquiry into the facts that manifest contractual intent***."  *Meisner Brem Corp. v.*

8   *Mitchell*, 313 F. Supp. 2d 13, 18 (D.N.H. 2004) (emphasis added); *see also Intelligraphics, Inc. v.*

9   *Marvell Semiconductor, Inc.*, 2009 U.S. Dist. LEXIS 9875, *at* *31 (N.D. Cal. Feb. 10, 2009).

10   Whether or not an implied license has been granted is a matter of law for the Court to decide.

11   *Effects*, 908 F.2d at 559 ("it seems to us to be a creature of law, much like any other implied-in-

12   fact contract").

13          Looking objectively at Plaintiffs' conduct, their actions before, at the time of, and after

14   delivery of the software all communicated that Plaintiffs intended to allow Chordiant to use the

15   software.  Plaintiffs offered the 2004 Upgrade terms to Chordiant, before it had ever even heard

16   of Chordiant International.  On at least three separate occasions, Plaintiffs provided software

17   support to Chordiant employees, identified as such.  In the April 2007 Vista discussions, Mr.

18   Wilson identified himself as program manager for CMD, listed his employer as "Chordiant

19   Software, Inc." and reported that "Chordiant Software" had been successfully using Netbula's

20   software for many years pursuant to the license—reflecting Chordiant's clear understanding of

21   entitlement to do so.  Ex. 34.  Yet Dr. Yue did not object until the day he filed suit eight months

22   later, allowing Chordiant to continue shipping CMD containing ONC RPC in the interim.  *Id*.

23   Meanwhile, Plaintiffs requested that Chordiant provide a "License Usage Report" it claimed to be

24   "based on a standard audit form" used by Netbula for its "customers."  Ex. 37; *see Parker v.*

25   *Yahoo!, Inc.*, 2008 U.S. Dist. LEXIS 74512, at *11 (E.D. Pa. Sept. 26, 2008) ("silence or lack of

26   objection may also be the equivalent of a nonexclusive license, especially where the plaintiff

27   knows of the defendant's use and encourages it.").  Indeed, Dr. Yue admits that "my

28   understanding was that [Oliver Wilson] was from—whoever purchased the license in 2004."

-13-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Depo. 287:12-18.  Dr. Yue admits he made no distinction whatsoever between Chordiant and

2   Chordiant International for three-and-a-half years, until at least October 2007.  Depo. 305:12-

3   306:4, 312:10-13, 322:13-323:1.  Where Netbula itself admits to treating Chordiant as an equal

4   licensee with Chordiant International, this conclusively establishes the conduct from which

5   Chordiant was entitled to infer consent.

6        All of these undisputed facts, viewed objectively, implied permission to use—regardless

7   of Plaintiffs' attempt to retract that permission at the time it filed suit.  *Parker,* 2008 U.S. Dist.

8   LEXIS 74512, at *15-17; *Field*, 412 F. Supp. 2d at 1116.  Every implied license occurs in a

9   situation in which the rights holder late claims it did ***not*** intend to grant a license, but where the

10  operation of law implies a license anyway.  "Belated statement[s]" that software could not be

11  used *after* the delivery of software "for which substantial sums were paid, [are] not sufficient to

12  negate all other objective manifestations of intent to grant . . . an unlimited license").  *See Asset*,

13  542 F.3d at 757; *cf. Meisner*, 313 F. Supp. 2d at 18 (engineer's objection to use of plans after

14  learning he had been fired did not alter fact he had already granted a license; his "subjective

15  intent, expressed after [he] was terminated from the Project, is insufficient to carry the day").

16       **C.      Plaintiffs are Estopped From Claiming Chordiant Infringed their Copyrights**

17       Plaintiffs' denial of Chordiant's license is similarly barred on the basis of estoppel, which

18  denies "a party the right to plead or prove. . . the act of infringement because of something he has

19  done or omitted to do."  *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 508 n.8 (4th Cir. 1969); *see*

20  *also Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 753 (E.D. Mich. Sept. 29, 1998) (summary

21  judgment granted; plaintiff was estopped from pursuing infringement claims by acceptance of

22  defendant's use over course of several years).  Four factors are relevant and all support estoppel

23  here: (1) did Plaintiffs know of the allegedly infringing conduct; (2) did Plaintiffs intend that

24  Chordiant rely upon their conduct or act so that Chordiant had the right to believe it was so

25  intended; (3) was Chordiant ignorant of the true facts; and (4) did Chordiant detrimentally rely on

26  Plaintiffs' conduct.  *Hadady Corp. v. Dean Witter Reynolds, Inc*., 739 F. Supp. 1392, 1400 (C.D.

27  Cal. 1990) (granting summary judgment on the estoppel defense); *Watermark Publrs. v. High*

28  *Tech. Sys*., 1997 U.S. Dist. LEXIS 22512, *20-21 (S.D. Cal. June 18, 1997).

-14-

(1)     Dr. Yue's repeated correspondence with Chordiant—in particular the numerous emails exchanged with Messrs. Akande and Wilson offering an upgrade and support—reflect that Plaintiffs knew that Chordiant was using ONC RPC. Exs. 7, 28, 32-37.  There is no dispute that Plaintiffs were aware that Chordiant's personnel, consistently identified as such, were deploying Plaintiffs' software.  *Field*, 412 F. Supp. 2d at 1117 (first element met when plaintiff knew Google would automatically allow access to his works unless instructed otherwise).

(2)     By providing support and advice for Chordiant's use of the software, and by treating Chordiant as a licensee while pursuing license usage reports, Plaintiffs created every reason for Chordiant to believe they accepted Chordiant's use and did not view Chordiant as lacking a license.  *Hadady*, 739 F. Supp. at 1400.

(3)     Even after Plaintiffs demanded Chordiant's license usage report, Plaintiffs did not question that Chordiant *had* a license to use the software—just whether it had violated purported license restrictions.  Faced with Plaintiffs' silence and inaction until the day of litigation, Chordiant was unaware Plaintiffs' had any objection to its status as licensee.  Wilson Dec. ¶ 32.

(4)     Chordiant's reliance on Plaintiffs' conduct has been to its substantial detriment. Had Chordiant earlier known of Plaintiffs' belated assertions, Chordiant could have purchased a separate $7,000 license, or replaced Plaintiffs' code years earlier for free.  *Id.*; s*ee also Keane*, 968 F. Supp. at 948 (reliance factor met by evidence defendant would have negotiated a license covering the disputed use or created a replacement).  Due to plaintiffs' conduct, Chordiant now faces a copyright infringement suit—sufficient grounds alone for meeting the detrimental reliance element.  *Hadady*, 739 F. Supp. at 1400 ("the present copyright infringement claim is evidence of defendant's reliance"); *Field*, 412 F. Supp. 2d at 1117.

In sum, whether as an express licensee, an implied licensee, or by virtue of estoppel, Chordiant's rights as a licensee have been fully established.

### III.    PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING THAT THE SCOPE OF THE LICENSES TO CHORDIANT WAS EXCEEDED

Prior to deciding that he had never granted Chordiant a license, Dr. Yue focused on claims that Chordiant exceeded purported restrictions in its license.  Two hurdles block this path.

-15-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

First, Plaintiffs' shoddy licensing practices preclude their proof of agreement to the license terms they wish to enforce.  Plaintiffs have sent their licensees blank form templates embedded on CDs with the software, have not required them to click through or otherwise assent to any agreements, and have not otherwise defined the license terms.  Having taken money from a licensee, it is incumbent on the copyright owner to prove the *scope* of any restrictions in the license at issue, and to bear the burden of proving that the defendant's copying was unauthorized.  *Bindview*, 516 F. Supp. 2d at 1150.[4]  The undisputed facts preclude such proof.

Second, "before [a plaintiff] can gain benefits of copyright enforcement, it must definitively establish that the rights it claims were violated are *copyright, not contractual*, rights."  *Sun,* 188 F.3d at 1121-22 (emphasis added).  If a licensor violates a *condition* of the license, the licensor may sue for copyright infringement, but where the licensee breaches a *covenant* in the agreement, the licensor's remedy is limited to an action on the contract.  *Id.; accord STC*, 2008 U.S. Dist. LEXIS 4119 at *8 (requiring "explicit language" creating condition).  For this reason, as well, Plaintiffs have no copyright claim, but at most a claim for breach of contract.

## A.    <u>Plaintiffs Cannot Prove that the Parties Agreed on the Purported Restrictions</u>

As licensor claiming breach, Plaintiffs bear the burden of establishing the contract terms.  *See Bindview*, 516 F. Supp. 2d at 1151 ("Copyright disputes involving only the scope of the alleged infringer's license present the court with a question that essentially is one of contract:  whether the parties' license agreement encompasses the defendant's activities.") (citing *Bourne*, 68 F.3d at 631).  In *Bindview*, Netbula could not meet its "initial hurdle" of proving the terms of the license restrictions it wished to enforce because it could produce no executed agreement.  516 F. Supp. 2d at 1151; *see also Vintage Verendah Inc. v. Mastercraft Int'l. Inc.*, 2006 U.S. Dist. LEXIS 91718 (E.D. Ark. Dec. 15, 2006) (dismissing copyright claim where documents outlining license were not in evidence).  Likewise here, at most, Plaintiffs can prove that they included templates of a form license agreement on computer disks sent to the Defendants—but they have

---

[4] Plaintiffs retain the burden of proof regardless of whether the nonexclusive license is express or implied.  *See Meisner,* 313 F. Supp. 2d at 20 (granting summary judgment absent evidence that defendants exceeded scope of implied license).

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT

CASE NO. C-08-0019-JW

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

no evidence that Defendants actually saw or assented to the purported license restrictions. *Id.* As a matter of law, therefore, the template form agreements cannot bind Defendants.

Courts addressing whether electronic license agreements are enforceable apply traditional principles of contract law and focus on whether the party to be bound had reasonable notice of and manifested assent to the agreement. *Specht v. Netscape Comm's Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) ("*Specht II*") (affirming that even users asked to read license agreement were *not* bound where software could be downloaded without unambiguously indicating an assent to the license terms). Plaintiffs acknowledge that there were no oral discussions of the licenses, only email exchanges. Depo. 107:10-109:11, 193:16-194:9. Where the material facts are undisputed as to the exchange of communications, the existence of a contract is a question for the Court. *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (2006).

First, while Plaintiffs *offered* Defendants a template of a form licensing agreement, there is no evidence Chordiant accepted the forms or otherwise indicated any assent. Manifestation of mutual assent is the touchstone of contract formation. *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999). This is as true for software contracts as any other. *Softman Prods. Co. v. Adobe Sys. Inc.,* 171 F. Supp. 2d 1075, 1087 (C.D. Cal. 2001) ("The case law on software licensing has not eroded the importance of assent in contract formation.") (quoting *Specht v. Netscape Comm's Corp.*, 150 F. Supp. 2d 585, 595-596 (S.D.N.Y. 2001) ("*Specht I*"), *aff'd.*, *Specht II*, 306 F.3d 17. By the templates' express terms, mere receipt was inadequate to create binding contractual restrictions on Chordiant, they required signatures and provided no other means for indicating acceptance. *See* Ex. 15 ("BY SIGNING BELOW, THE PARTIES INDICATE THEIR ACCEPTANCE OF THE FOLLOWING AGREEMENT"); Ex. 18 (same). "A vendor, as a master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance." *ProCD, Inc. v. Zeidenbert*, 86 F.3d 1447, 1452 (7th Cir. 1996). That happened here, but it is undisputed that Chordiant did not accept in the manner specified. Plaintiffs cannot, after the fact, rewrite the terms of acceptance to match the facts.

Second, the terms of the form licenses cannot bind Defendants because there is no proof

-17-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

they saw or otherwise received notice of them.  "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent … are essential if electronic bargaining is to have integrity and credibility."  *Specht*, 306 F.3d at 35; *cf. Cairo, Inc. v. Crossmedia Servs. Inc.*, 2005 U.S. Dist. LEXIS 8450 at * 13 (N.D. Cal. April 1, 2005) (distinguishing *Specht* on the basis that there, "[t]he evidence did not demonstrate that one who had downloaded Netscape's software had necessarily seen the terms of its offer").  Even where Netbula included its standard license form on disks with the software, "a customer could install and use the software without being forced (or even asked) to read, click on, or otherwise acknowledge or accept any terms or conditions of use." *Bindview*, 516 F. Supp. 2d at 1152 (following *Specht I*).  The disks on which the ONC RPC software arrived reflected that Defendants already held "One Developer" and "1000 runtime" licenses.  Exs. 21, 26.  They gave no notice that the licenses were conditioned upon acceptance of further terms.  *Id.*; Wilson Dec. ¶¶ 16, 24-25.  Even the "Installation tips" Dr. Yue wrote in 2004 giving instructing on how to copy and use the SDK *without* any need to click through the template did not refer to the template *or any other licensing terms.  Id.* ¶ 24; Ex. 25 at 1224.  Plaintiffs have no proof that the Defendants had notice of the form templates, let alone that they read them.  As a matter of law, therefore, the form templates cannot be binding upon them.

    The existence of purchase orders and invoices cannot compel a different outcome from *Bindview.  Plaintiffs* bear the burden of proving defendant's copying exceeded the scope of their license.  *Bindview*, 516 F. Supp. 2d at 1150.  Evidence that Chordiant ordered products by the names Plaintiffs specified for submitting orders cannot prove the contract restrictions Plaintiffs assert.  Nor can Plaintiffs prove any terms of the license by referring to its own invoices.  "An invoice, as such, is no contract.  An invoice is a mere detailed statement of the nature, quantity, and the cost or price of the things invoiced." *India Paint and Lacquer Co. v. United Steel Prds. Corp.,* 123 Cal. App. 2d 597, 608 (1954)  (quoting *Tanenbaum Textile Co. v. Schlanger*, 40 N.E.2d 225 (N.Y. 1942)).  Thus, a buyer is ordinarily not bound by statements on an invoice which are not a part of the original agreement.  *Id.* at 610-611.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

**B.      Plaintiffs Must Prove that Each Restriction was a Condition, Rather than a Covenant in Order to Prove Copyright Infringement**

3       Even if Plaintiffs could prove the parties' mutual assent to any of the proposed

4   restrictions, their copyright claims fail as a matter of law for a second reason:  none of the

5   disputed terms can be construed as a *condition precedent* that limits the scope of the licenses

6   granted.  *Sun Microsystems, Inc. v. Microsoft Corp.*, 2000 U.S. Dist. LEXIS 20222, *18 (N.D.

7   Cal. May 8, 2000) ("*Sun II*") (granting summary judgment upon concluding disputed license

8   terms were independent covenants, not limitations on scope of license).

9       Determining whether terms are covenants or conditions precedent requires the Court to

10  construe the license according to applicable state law to the extent such rules do not conflict with

11  federal copyright law and policy.  *Sun,* 188 F.3d at 1122.  Under California law, it is a bedrock

12  principle that conditions precedent "are disfavored and will not be read into a contract unless

13  required by plain, unambiguous language."  *Effects,* 908 F.2d at 559 n.7; *accord. STC*, 2008

14  LEXIS 4119 at *22 ("courts should not imply [conditions precedent] when they are not in the

15  language of the contract").

16      In analyzing whether terms are conditions precedent, courts look for express indications

17  that the license ***grant*** is subject to, conditional on, or limited by compliance with the obligation.

18  In *Sun II*, Sun's license of Java to Microsoft contained a provision requiring Microsoft to make its

19  software compatible with future Sun products.  Despite the critical importance of that business

20  term, Judge Whyte held the requirement to be an independent condition because the language of

21  the contract "says nothing about the license grants being subject to, conditional on, or limited by

22  the compatibility obligation."  2000 U.S. Dist. Lexis 20222 at *12-13, *17.  This Court in *STC*

23  held that Netbula's distribution licenses were not conditioned upon prepayment where terms did

24  not "make explicit that the licensing rights ceased upon failure to prepay, thus making the

25  condition precedent to the license explicit."  2008 U.S. Dist. LEXIS 4119 at *22.  This Court

26  further held that limitations on the number of users were a separate contractual promise that did

27  not limit or condition the license grant.  *Id.* at *18.  In *Effects,* the Ninth Circuit declined to read a

28  condition requiring payment in full into an implied license, in part because the parties never

-19-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   communicated that failure to pay would expose the user to copyright infringement liability.  908

2   F.2d at 559.  By contrast, in *Jacobsen v. Katzner*, the Federal Circuit found a contract conditional

3   based on *explicit restrictions* in a license that used "the traditional language of conditions by

4   [granting rights] '*provided that*' the conditions are met."  535 F.3d 1373, 1381 (Fed. Cir. 2008).

5       Here, the terms of the license agreements between the parties are impossible to ascertain

6   from an integrated, written license as Plaintiffs did not obtain one.  For this reason, alone,

7   Plaintiffs cannot meet *their burden* of proving use beyond the scope of the license.  As set forth

8   further in the next section, however, what few documents there are simply do not use the

9   requisite language or structure to create conditions precedent.

10       **C.**    **Plaintiffs Cannot Carry Their Burden To Demonstrate Breach of the**

11           **Purported Conditions In the Distribution License**

12         **1.**    **Platform Restrictions.**

13       Plaintiffs contend that the "1000 runtime" (i.e. distribution) licenses described on the CD

14   labels were restricted to distribution only on particular platforms—i.e., that Chordiant was

15   precluded from supporting future versions of Microsoft Win32 systems.  But the only reference to

16   platforms on the CD labels are to "Win32," not to versions thereof.  Exs. 21, 26.  Even

17   considering other communications, Plaintiffs can prove neither any agreement that platform limits

18   were a precondition to the license, nor any violation of such a restriction.

19       **(a)**    **2004 Upgrade:**  Chordiant's 2004 PO reads "*support* NT/2K/XP/Server2003," not

20   "*limit to*" or "under" those platforms.  Ex. 23 (emphasis added).  Identification of what Netbula

21   supports hardly creates an unambiguous precondition to Chordiant's distribution.

22       Moreover, the only platform *not* listed on the 2004 purchase order was Vista (in a Win32

23   version).  Chordiant's support for Vista lasted only a few weeks, ceasing (as a prophylactic

24   measure) as soon as Dr. Yue claimed Vista was outside the license.  Wilson Dec. ¶¶ 33, 36-39.

25   Having acquiesced and assisted Chordiant's effort to work with Vista in April, 2007 (Ex. 34 at

26   NC57), Netbula is estopped to object to Vista use prior to the time Netbula complained.

27       **(b)**    **2000 License**. The 2000 purchase order read "ONC RPC for Windows NT/95

28   limited application distribution license."  Ex. 11 at NC990.  This was merely the *name Netbula*

-20-

*gave to the product*, not a license conditioned on restriction to NT and 95.  *See STC*, 2008 U.S.

Dist. LEXIS 4119 at *17 (terms identifying *what* the purchase of a license gives the buyer do not

limit *how* the software may be used, and accordingly are not conditions).  In fact Dr. Yue has

admitted that this product *did* support additional platforms in 2000 (such as Windows 98).  Depo.

128:18-129:4; 132:3-11; 134:1-4; 134:21-135:2; 135:12-20; Ex. 16.   Further, while the form

templates are neither binding nor evidence of Chordiant's assent, they are evidence of *Plaintiffs'*

intent.  *See Asset*, 542 F.3d at 756 (unexecuted contracts may evidence the intent of the party

*submitting* the contract).  The forms proposed *no* platform restriction on the distribution licenses,

either in 2000 or 2004.  Exs. 15, 18.  Platform restrictions appeared only in the separate SDK

license.  *See STC,* 2008 U.S. Dist. LEXIS at *17-19 (finding only SDK and not distribution

licenses limited to specified platform according to terms of agreement identical in this respect to

the form templates).[5]

 Even if the 2000 License had been restricted to certain platforms, any such restrictions

were erased by Chordiant's 2004 purchase of a "standard support/maintenance contract (back

2000-2004)."  Ex. 24.  Dr. Yue admitted that this term was undefined and unexplained by any

documentation. Depo. 247:14-21.[6]  Nevertheless, Dr. Yue also described what his support

contracts generally entitle a customer to receive—testimony that corroborates entitlement to new

platforms.  Depo. 184:18-185:15 (under seal).  *Id.*; *see also* Depo. 244:13- 245:2 ("customer who

---

[5] Other potential "evidence" of Netbula's intent to limit distribution licenses to particular
platforms is utterly conflicting and so completely confused in its references to platforms that it
cannot support finding a platform pre-condition.  In March 2000 Netbula's webpage referred to
the same product as "ONC RPC for Windows NT/95" and "ONC RPC for Windows NT," though
it was also being sold at that time for Windows 98.  Depo. 147:14-150:13.  It also stated that a
user of the so-called "Windows NT SDK" could develop products for Windows NT or Windows
95 (Depo. 147:14-150:13; Ex. 20), reflecting that the name of the product did not control the
platforms on which it could be used.  Dr. Yue admitted that when the website described his
product as "Win32 (NT/98/95/2000)" the parenthetical described "the operating systems that was
[sic] supported at that time" (Depo. 150:14-152:4)—not a limitation.  And, although Dr. Yue
admits that he now licenses Netbula products for distribution on multiple operating systems under
one license (Depo. 254:5-255:17), his webpage says exactly the opposite. Ex. 31 at 1 (distribution
license is "for one operating system").

[6] Remarkably, notwithstanding his invoice and emails in 2004 stating that charging for back
support was his "standard" way of providing upgrade contracts, Dr. Yue testified that, in truth,
"this wasn't a standard practice."  Depo. 251:18-252:6.  If Dr. Yue did not even have a standard
practice regarding back support, he has no facts to prove agreed terms for same.

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT

CASE NO. C-08-0019-JW

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   bought this upgrade [i.e., standard support maintenance contract back 2000-2004, was] entitled to

2   use the upgrades for whatever platforms come out in the particular years"). As Dr. Yue defined

3   back support, Chordiant's license entitled it to the new platforms released from 2000-2004. In

4   these circumstances, Plaintiffs cannot meet their burden to demonstrate any license restrictions

5   precluding Chordiant's use of any platforms prior to the 2004 License.[7]

6           **(c)     Not a Condition.**  In all events, for both 2000 and 2004, there is no evidence that

7   the grant of 1000 runtime distribution license was *conditioned* on any purported platform

8   restriction. In *STC,* an explicit restriction to use "under" specified platforms in the ***signed SDK***

9   license was "part and parcel of the license grant itself."  2008 U.S. Dist. LEXIS 4119 at *18.  By

10  contrast, here Netbula can point to no "plain, unambiguous language," *Effects*, 908 F.2d at 559

11  n.7, making platforms a condition to a distribution license.

## 2.    Server Machine Restrictions.

13          The 2000 and 2004 CD labels license distribution for servers as well as clients.  The

14  labels—which Dr. Yue wrote and admits were intended to describe license terms (Depo. 176:12-

15  179:22, 220:9-221:14)—describe "1000 mach runtimes" and "1000 runtimes" respectively, with

16  no language excluding servers.  Plaintiffs concede that the 2000 License applied to distributions

17  for client or server software equally.  Depo. 176:12-179:22.  Because Chordiant understood the

18  same, it developed a product that used the runtimes on servers.  Wilson Dec. ¶ 17; Ex. 44.

19          For 2004, however, Plaintiffs claim that the inclusion of the word "client" between "1000"

20  and "runtimes" in the Upgrade order must be taken as manifesting Chordiant's intent to foreclose

21  continued use on servers.  But there is no evidence that Chordiant so intended.  It is undisputed

22  that the word "client" originated from "Dave King's" description that "Chordiant purchase [sic]

23  1000 client runtime in January 2000."  Ex. 7.  In fact, Dr. Yue admits that he understood the 2000

24  _____

[7] Any claims for the period prior to the 2004 License are also barred by the three year statute of
25  limitations. 17 U.S.C. § 507.  Dr. Yue began an audit of Chordiant in "Dave King's" email of
    March 10, 2004, but chose to stop because he decided there was too little at stake, and he wished
26  to sell an upgrade instead. Ex. 7; Depo. 250:16-252:6.  Plaintiffs cannot commence an action
    more than four years later, seeking to reopen the same, time barred issues. *See Wood v. Santa*
    *Barbara Chamber of Commerce, Inc.*, 507 F. Supp. 1128, 1134-1135 (D. Nev. 1980) (dismissing
27  copyright claims as plaintiff had been put on inquiry notice of the alleged infringement prior to
    statutory period) (cited by *Roley v. New World Pictures*, 19 F.3d 479, 481 (9th Cir. 1994)
28  (granting summary judgment on statute of limitations defense).

-22-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

License actually included clients *and* servers; Netbula changed its business model to distinguish servers from clients only two years *after* the 2000 License. Depo. 199:7-10. Moreover, to provide the 2004 quote, Dr. Yue had "found the [2000] invoice" (Ex. 7) which confirmed "1000 **machines**" on its face. Ex. 11 at NC264 (emphasis added).[8] Thus, when Chordiant asked for "a similar licensing agreement as we had with the initial purchase," so that it could keep doing what it was doing, there is no evidence it intended to terminate its acknowledged rights to servers.

If Dr. Yue now claims that "1000 client runtimes" equated to "0 server runtimes," the Upgrade order does not say that; he did not say that to Chordiant at the time (Ex. 7); and he admitted in his deposition this is not what he meant when *he* communicated to Mr. Akande. When asked "did you mean, when you told [Akande] that Chordiant purchased 1,000 client runtimes, to suggest that they did not have any right to use on servers," Dr. Yue answered "No. I'm not making any suggestion one way or the other." Depo. 203:14-18. Just as Dr. Yue did not express that "1000 client runtimes" negated the use of servers when he used that term (Ex. 7), there is no evidence that Chordiant intended that term to cutoff its rights to servers, rather than that *client* copies would be the metric counted. *See* Wilson Dec. ¶ 12. Indeed, the runtime files licensed in 2000 and upgraded in 2004 included portmap.exe—which runs *only* on the server side. Depo. 91:11-92:1; Ex. 25 at 1225 (CD delivered portmap in file labeled "runtime.lic"). Three of the four platforms "supported" for distribution in the 2004 PO were *server* platforms (NT, 2k and 2003 Server). Wilson Dec. ¶ 20. There is no evidence to read an authorization for 1000 clients to preclude continued use on such servers of server-side runtimes.

Finally, there is no explicit contractual language conditioning the runtime licenses on exclusion of server uses. Since Chordiant needed to continue to use the runtimes on servers, there is no evidence that it agreed that its license was *conditioned* on not doing so.[9]

---

[8] Indeed, if Netbula claimed the mere word "client" in the purchase order constitutes a condition on the license, its presence is because of Netbula's false characterization of Chordiant's prior license as for "1000 client runtime." Netbula cannot rely on a falsely inserted term to prove Chordiant's understanding that it would, or agreed to, cutoff its server rights.

[9] The template form Netbula offered in 2004 further confirms that Netbula, too, viewed the client/server distinction as one of payment, not scope. The template would grant a "perpetual, worldwide, irrevocable license to copy, sublicense, transfer, demonstrate and distribute the NETBULA RPC Supporting Programs and components . . . set forth in Exhibit B. . . ." (cont'd)

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT

CASE NO. C-08-0019-JW

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### 3.    Quantity and Prepayment.

Plaintiffs argue that Chordiant may have distributed more runtime licenses than it paid for in advance, which Chordiant disputes based on a license count of 953 distributions.  But regardless of the outcome, summary judgment is appropriate, as Judge Jenkins concluded in *STC*.  The *STC* license, like the templates Netbula offered here (Exs. 15, 18), required the licensee to pay Netbula as set forth in "Exhibit C," which provided that Netbula agreed to offer additional units of limited distribution licenses at certain prices.  2008 U.S. Dist. LEXIS 4119 at *21.  The Court concluded that, even if one assumed that additional runtime units had to be prepaid before distribution, this would constitute a contractual covenant, not a condition limiting the scope of the license grant.  *Id.* at *22 ("[n]owhere . . . in the entirety of the licenses is there any notion" that prepayment was a condition precedent to the license).  "[C]onditions precedent are disfavored and courts should not imply them where they are not in the language of the contract."  *Id.*

In the present case, Plaintiffs can provide no agreed contractual language at all.  *A fortiori*, they can make no claim that prepayment for added runtimes was a condition, and even the template they *offered* cannot support such an interpretation.

### D.    Plaintiffs Cannot Prove Use Outside the Scope of the SDK License.

Plaintiffs' SDK licenses allow the licensee's programmer to use ONC RPC files to develop applications using the RPC protocol.  SAC ¶17.  The CD labels in 2000 and 2004 identify minimal limitations on the SDK license, describing the "development toolkit" as "Win32" and as "one developer."  Exs. 21, 26.  Chordiant complied with these terms: it never had more than one developer using the toolkit, and used it only on Win32.  Plaintiffs' efforts to erect added restrictions on use of the SDK are without merit.

### 1.    Platform Restrictions.

Not only do the CD covers contain no reference to the platform restrictions, likewise, the purchase orders and invoices in both 2000 and 2004 each describe the SDK simply as Win32.

---

Ex. 18.  This unconditional license grant expressly included portmapper (a server-side file) and pwrpc32.dll (a runtime on server and client sides) (Depo. 335:25-337:12) within the Supporting Programs.  Significantly, the only differentiation between client and server uses occurs in the *payment* provisions, Exhibit C of the template agreement, which does not limit the license grant as to servers; it merely requires payment of a different price.  Ex. 18.

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT

CASE NO. C-08-0019-JW

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  Ex. 11 at NC264, NC990; Ex. 24.  Plaintiffs' only source of purported platform limits on use of

2  the SDK are the template forms, which are simply ineffective due to lack of assent.

3       There is also no evidence that the SDK was used on any platform Plaintiffs might claim to

4  be unauthorized. Although Mr. Wilson tested *Chordiant's* software to get it to work on Vista, he

5  did not load or run the SDK on Vista.  Wilson Dec. ¶ 33.  Hence, there was no possible violation.

6              **2.**    **Number of Users and Copies.**

7       Chordiant also complied with the "one developer" term on the SDK, as no more than one

8  developer was ever using the software at Chordiant.  Wilson Dec. ¶ 14.  Netbula apparently

9  claims that, whenever a given developer quit, was fired, was injured, took maternity leave, or was

10  transferred to another post, replacing that employee would violate the "one developer" provision.

11  Nothing in the license specifies such an onerous term.  The licensee, Chordiant Software, is

12  entitled to have one developer using the software, and that is what occurred.

13       Plaintiffs' additional purported restrictions— limiting copying of the SDK in the

14  development process or the number of computers the developer could work on—are found

15  nowhere other than in the templates, which are irrelevant here, given the lack of any proof of

16  assent.  In any event, this Court has already found that such a limitation cannot support a

17  copyright claim. *STC*, 2008 LEXIS 4119 at *16 (holding that agreement stating "one user may

18  use each" of the SDK licenses purchased was not a limitation on scope of license).

19                 **CONCLUSION**

20       For the foregoing reasons, the Court should enter summary judgment that Chordiant's

21  license precludes Plaintiffs' claims.  Alternatively, the Court should enter summary adjudication

22  rejecting the copyright claim as to each of the alleged license restrictions as to which no factual

23  issue has been established.

                        FENWICK & WEST LLP

24  Dated: March 2, 2009

25                      By:        s/Laurence F. Pulgram

26                          Laurence F. Pulgram

27                    Attorneys for Defendants
                  CHORDIANT SOFTWARE, INC., DEREK P. WITTE,
28                    and STEVEN R. SPRINGSTEEL,

DEFENDANTS' NOTICE OF MOTION AND
MPA ISO SUMMARY JUDGMENT                       CASE NO. C-08-0019-JW