IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Netbula, LLC, et al., | NO. C 08-00019 JW |
| Plaintiffs, <br> v. | **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Chordiant Software, Inc., et al., | |
| Defendants. / | |

## I. INTRODUCTION

Dongxiao Yue ("Dr. Yue") and Netbula, LLC ("Netbula") (collectively, "Plaintiffs") bring this action against Chordiant Software, Inc. ("Chordiant Inc."), Steven R. Springsteel ("Springsteel"), and Derek P. Witte ("Witte"), (collectively, "Defendants") alleging copyright infringement and vicarious copyright infringement. Plaintiffs allege that Defendants infringed Plaintiffs' copyrights by reproducing copyrighted computer programs and incorporating that material into unauthorized derivative works.

Presently before the Court is Defendants' Motion for Summary Judgment.[1] The Court conducted a hearing on April 6, 2009. Based on the papers submitted to date and oral argument, the Court DENIES Defendants' Motion for Summary Judgment.

---

[1] (Defendants' Notice of Motion, Motion and Memorandum of Points and Authorities in Support of Summary Judgment or Summary Adjudication, hereafter, "Motion," Docket Item No. 104.)

## II. BACKGROUND

**A.   Undisputed Facts**

### 1.   Plaintiffs' Software

In January 2000, Netbula owned the copyrights to several pieces of software ("the Software") developed by Dr. Yue, Netbula's founder and sole employee.[2] Among other duties, Dr. Yue sold licenses to use the Software on behalf of Netbula. (Id.) The Software is a form of open network computing remote procedure recall ("ONC RPC") created for use with Microsoft Windows 32-bit operating systems. (Milionis Decl., Ex. 48 at 63.) The Software allows a program on one computer to execute a command remotely on a separate computer. (Motion at 4; Milionis Decl., Ex. 30.) The Software has two parts: (1) a Software Development Kit ("SDK") that consists of the software tools that allow licensed programmers to create applications using the ONC RPC standard, including a file called "rpcgen.exe"; and (2) "runtime software" that consists of files that must be installed to provide the remote call functionality to applications developed using the SDK. (Second Amended Complaint ¶ 16, Docket Item No. 91; Motion at 4.)

### 2.   Chordiant Inc.'s Use of Plaintiffs' Software

One of Chordiant Inc.'s products is the Chordiant Marketing Director ("CMD"), which is developed, in part, by using the Software.[3] The pre-cursor product to CMD was originally developed by a separate company called Prime Response, Inc. ("Prime Response"), a Delaware Corporation. (Wilson Decl. ¶ 4, Ex. A.) Prime Response, Ltd. ("Prime Response UK") was a United Kingdom subsidiary of Prime Response.[4] In January 2000, Prime Response UK purchased from Plaintiff Netbula an SDK license for one software developer and a distribution license for 1000

---

[2] (Motion at 5; Declaration of Mary E. Milionis in Support of Defendants' Motion for Summary Judgment, Ex. 11, hereafter, "Milionis Decl.," Docket Item No. 105.)

[3] (Declaration of Oliver Wilson in Support of Defendants' Motion for Summary Judgment ¶¶ 3-4, hereafter, "Wilson Decl.," Docket Item No. 106.)

[4] (Wilson Decl. ¶ 4; Declaration of Dongxiao Yue in Opposition to Defendants' Motion for Summary Judgment, Ex. 24, hereafter, "Yue Decl.," Docket Item No. 120.)

copies of the runtime component of the Software ("2000 Prime Response UK License"). (Milionis Decl., Ex. 11; Yue Decl., Ex. 3.)

In January 2001, Defendant Chordiant purchased Prime Response through a reverse triangular merger. (Wilson Decl. ¶ 4, Ex. A, B.) In May 2001, Chordiant Inc. changed the name of Prime Response UK to Chordiant Software International Limited ("Chordiant International"). (Yue Decl., Ex. 24.) Chordiant International maintained its status as a separate United Kingdom corporation. (Id.) In 2004, Chordiant moved its operations concerning CMD to New Hampshire. (Wilson Decl. ¶ 4.)

### 3.     Chordiant's 2004 Upgrade Purchase

In February and March 2004, Chordiant Inc. solicited Netbula for an updated version of the Software after discovering that an upgraded version would resolve a problem Chordiant Inc. was experiencing with one of the Software's runtime files. (Wilson Decl. ¶ 18; Milionis Decl., Ex. 7.) In April 2004, an office manager at Chordiant International sent a purchase order to Netbula for an SDK license and 1000 "client runtime licenses" to the upgraded version of the Software ("2004 Chordiant Upgrade"). (Milionis Decl., Ex. 28.) Netbula then sent an invoice and CD with the upgraded version of the Software to Chordiant International in the United Kingdom, and emailed an upgraded copy of the SDK component of the software to an employee located in the United Kingdom at Chordiant International's office. (Id.)

### 4.     2007 License Usage Reports

In August 2007, Netbula began requesting "License Usage Reports" from Chordiant Inc. (See Milionis Decl., Ex. 37.) After months of back-and-forth communication between Netbula and Chordiant Inc., Chordiant Inc. sent Netbula a usage report in December 2007 stating that Chordiant Inc. had used 953 runtime "units." (Id., Ex. 41.) On the same day that Chordiant Inc. provided its license usage report, Netbula informed Chordiant Inc. that Netbula believed Chordiant Inc. was infringing Netbula's copyright. (Id., Ex. 42.)

3

**B.     Procedural Background**

On January 2, 2008, Plaintiffs filed this law suit alleging copyright infringement against Chordiant Inc. and vicarious copyright infringement against Defendants Springsteel and Witte. (See Docket Item No. 1.) On March 20, 2009, the Court dismissed Plaintiffs' vicarious copyright infringement claims against Springsteel and Witte with leave to amend. (March 20, 2009 Order, Docket Item No. 121.) On April 6, 2009, Plaintiffs filed an Amended Complaint re-alleging copyright infringement by Chordiant Inc. and vicarious copyright infringement by Springsteel and Witte. (See Docket Item No. 130.)

Presently before the Court is Defendants' Motion for Summary Judgment.

## III.  STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion . . . ." Id. at 323. "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The non-moving party "may not reply merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

When evaluating a motion for summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). The court draws all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight that particular evidence is

1 accorded. See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992). The court
2 determines whether the non-moving party's "specific facts," coupled with disputed background or
3 contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.
4 T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987). In such a case,
5 summary judgment is inappropriate. Anderson, 477 U.S. at 248. However, where a rational trier of
6 fact could not find for the non-moving party based on the record as a whole, there is no "genuine
7 issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

Defendants move for summary judgment on the ground that Chordiant Inc. has a license to use the Software pursuant to the 2000 Prime Response UK License and the 2004 Chordiant Upgrade. (Motion at 11-12.) In the alternative, Defendants move for summary judgment on the grounds that Chordiant Inc. obtained an implied license from Netbula to use the Software and that Plaintiffs are estopped from asserting copyright infringement because Chordiant Inc. justifiably relied on Plaintiffs' conduct in using the Software. (Motion at 12-15.) The Court considers these issues in turn.

### A. Express License to Use the Software

At issue is whether Defendant Chordiant Inc. had an express license to use Plaintiffs' Software. (Motion at 11-12.) Plaintiffs contend that the 2000 Prime Response UK License and the 2004 Chordiant Upgrade were not licenses granted to Defendant Chordiant Inc., but rather licenses granted to Prime Response UK and Chordiant International, non-parties to this action. (Opposition for Summary Judgment at 9-10, hereafter, "Opposition," Docket Item No. 119.)

An express, nonexclusive, copyright license may be granted orally or in writing. Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990). A federal court must look to state contract law to determine whether a copyright license has been granted. Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821, 826 (9th Cir. 2001). Under California law, a court must interpret a contract according to the parties' intent. Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 18

5

(1995). Where the terms of the contract are unambiguous, a court must enforce the contract according to its plain meaning. Id. However, where the terms of the contract are ambiguous–i.e., susceptible to more than one reasonable construction–extrinsic evidence must be introduced to determine the parties' intent. Benach v. County of Los Angeles, 149 Cal. App. 4th 836, 847 (2007). Determining whether a contract is ambiguous is a question of law for which a court may look to extrinsic evidence to divine the parties' intent. Id. However, where the interpretation of a contract turns on the credibility of conflicting extrinsic evidence, a question of fact exists that must be resolved by the trier of fact. Id.

In this case, the parties do not dispute most of the circumstances surrounding the 2000 Prime Response UK License and the 2004 Chordiant Upgrade. Instead, the parties dispute the factual inferences that should be drawn from those circumstances. The parties present the following evidence:

- Plaintiff Netbula admitted in its 30(b)(6) deposition that it "granted to [Prime Response UK] [a] license" to the Software. (Milionis Decl., Ex. 46 at 105-106.) Netbula testified that its CD labels "usually contain a brief description of what the customer have [sic] purchased in terms of license grant." (Id., Ex. 46 at 159-60.) The label of the CD containing the Software shipped to Prime Response UK states "Licensed to Prime Resposne [sic] UK, One Developer, 1000 mach runtime." (Id., Ex. 21.)

- In January 2001, Chordiant Inc. purchased Prime Response, the parent corporation of Prime Response UK and changed the name of Prime Response UK to Chordiant International, but maintained Chordiant International as a separate United Kingdom corporation. (Wilson Decl. ¶ 4, Exs. A, B; Yue Decl., Ex. 24.)

- On February 18, 2004, Toye Akande emailed Netbula stating, "We licensed your product to use in 2000. . . . Have you got an updated copy of the PowerRPC dll?" (Milionis Decl., Ex. 7 at 7.) The signature line of Akande's email stated "Toye Akande, Engineering Department, Chordiant Software, Inc." (Id.) After a series of emails discussing technical issues with the Software, Netbula emailed Akande, asking "When were the licenses purchased? What was the invoice number for the license purchase? Was your company under another name? somehow [sic] I could not find Chordiant in our customer database." (Id. at 2.) Akande responded by stating "I might have mentioned that the invoice would have been raised under the previous company name of Prime Response Ltd. We are based in 2 goat Wharf, Brentford, Middlesex, UK, TW8 0BA." (Id.)

- On April 2, 2004, a purchase order from "Chordiant Software Intl Ltd" was submitted to Netbula, requesting "1000 client runtime licenses . . . standard support/maintenance contract . . . upgrade to the current version of the SDK."

6

1  (Milionis Decl., Ex. 24 at 2.)  On April 27, 2004, Netbula sent an invoice for "1000
2  ONC RPC WIN32 Client runtime upgrade (NT/2K/XP/Server 2003) Standard
   support/maintenance contract (back 2000-2004), ONC RPC Win32 SDK Upgrade."
3  (Id., Ex. 24 at 1.)  The invoice lists the "Customer" as "Chordiant Software Intl Ltd, 2
   Goat Wharf, Brentford, UK."  (Id.)  Netbula mailed a disk to Chordiant International
4  stating "Licensee Chordiant Software Developer 1000 Runtime (s1030)."  (Id., Ex.
   26.)

5       The evidence indicates that Netbula granted two licenses.  First, the 2000 license

6 unambiguously granted a license to Prime Response UK.  Although Defendants contend that

7 Chordiant Inc. possesses a license as the parent corporation to Prime Response UK's successor

8 company, Chordiant International, the evidence shows that Chordiant Inc. and Chordiant

9 International have always remained separate entities and there is no evidence indicating that a valid

10 transfer of Prime Response UK's license was ever made to Chordiant Inc.  Thus, the Court finds

11 Chordiant Inc. does not possess a license to the Software pursuant to the 2000 Prime Response UK

12 license.

13       With respect to the 2004 Chordiant Upgrade, the CD sent to Chordiant International lists

14 "Chordiant Software" as the licensee, but does not identify whether Chordiant Software

15 International Limited, a United Kingdom corporation, or Chordiant Software, Inc., a Delaware

16 corporation, is the intended licensee.  The extrinsic evidence regarding the negotiations to the

17 license does not resolve the ambiguity.  A reasonable jury could find that the communications

18 between Netbula and Chordiant Inc. evidence an intent to grant Defendant Chordiant Inc. a license

19 to the upgraded version of the Software because of the identification of Chordiant Software, Inc. in

20 the signature line of Toye Akande's email.  However, a reasonable jury could also find that Netbula

21 intended to grant a license to Chordiant International based on Akande's representation that his

22 company was the successor to the Prime Response UK license and the fact that the invoice and

23 purchase order were sent to and received from Chordiant International in the United Kingdom.

24 Neither party submits evidence showing whether Chordiant International or Defendant Chordiant

25 paid for the 2004 license.  Thus, the Court finds a genuine issue of material fact exists as to whether

26 Chordiant Inc. has an express license to the 2004 Chordiant Upgrade.

7

In response to the conflicting evidence, Defendants contend that summary judgment is still appropriate because, in light of the fact that some license was granted by Netbula to some Chordiant entity, Plaintiffs bear the burden on summary judgment of showing that the scope of those licenses did not include Chordiant Inc. (Motion at 11.) According to Defendants, Plaintiffs have not met this burden because "the undisputed evidence reflects no agreement to exclude Chordiant as a licensee." (Defendants' Reply Memorandum in Support of Chordiant's Motion for Summary Judgment at 2, hereafter, "Reply," Docket Item No. 125.)

A copyright owner who grants a nonexclusive license waives his right to sue for copyright infringement, unless the owner can show that the license is limited in scope and the licensee has acted outside the scope of the license. Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1121-22 (9th Cir. 1999). "[W]here the existence of a license agreement is not in dispute, and the scope of the license is the only issue, the copyright owner bears the burden of proving that the copying was unauthorized." Netbula, LLC v. Bindview Dev. Corp., 516 F. Supp. 2d 1137, 1150 (N.D. Cal. 2007).

In this case, the scope of the license is not the only disputed issue. While the parties agree that some license was granted by Plaintiff Netbula, there are genuine issues of material fact as to whether a license was granted to Defendant Chordiant Inc. Thus, the law does not place the burden on Plaintiffs to show that Chordiant Inc. acted outside the scope of a license.

Accordingly, the Court DENIES Defendants' Motion for Summary Judgment based on the existence of an express license to Chordiant Inc. to use Plaintiffs' Software.

**B.    Implied License to Use the Software**

At issue is whether Defendant Chordiant Inc. had an implied license to use Plaintiffs' Software. (Motion at 12-14.) Plaintiffs contend that Chordiant Inc. does not have an implied license because Netbula treated Chordiant as a licensee based only on its belief that Chordiant Inc. was actually Chordiant International. (Opposition at 14-16.)

8

A copyright owner may grant a nonexclusive license expressly or impliedly through conduct. Asset Marketing Systems, Inc. v. Gagnon, 542 F.3d 748, 754 (9th Cir. 2008). An implied license is granted when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." Id. Some courts have held that an implied license can exist even where the copyright owner does not create a custom work for the putative licensee. See Field v. Google Inc., 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006); Keane Dealer Servs., Inc. v. Harts, 968 F. Supp. 944, 947 (S.D.N.Y. 1997). In all cases, the relevant inquiry is "the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct." Asset Marketing Systems, 542 F.3d at 756 (citing Effects Assoc., Inc. v. Cohen, 908 F.2d 555, 559 n.6 (9th Cir. 1990)). Whether the licensor intended to grant an implied license "is a question of fact that must be left to the jury." Intelligraphics, Inc. v. Marvell Semiconductor, Inc., No. C 07-2499 JCS, 2008 WL 3200212, at *6 (N.D. Cal. Aug. 6, 2008).

In this case, the parties' dispute centers on whether Netbula's conduct exhibited an objective intent to allow Chordiant Inc. to use the Software. In addition to the evidence regarding the issuance of the 2000 Prime Response UK License and the 2004 Chordiant Upgrade discussed above, Defendants provide emails from April 2007 and October 2007 discussing some Chordiant entity's use of the Software and identifying Chordiant employees as employees of "Chordiant Software, Inc." in the signature line at the bottom of their emails. (See Milionis Decl., Exs. 34-35, 41.) Defendants also provide the following emails:

- A June 2004 email from Toye Akande stating "We have now installed the latest version of the Netbula ONC-ROC [sic] kit." (Milionis Decl., Ex. 32.) The signature line to Akande's email stated "Toye Akande, Chordiant Software, Inc., Brentford, Middlesex, United Kingdom." (Id.) Netbula responded by stating "We will get back to you on this ASAP." (Id.)

- An August 2005 marketing email from Netbula to Oliver Wilson, a Chordiant employee located in New Hampshire, which addressed Wilson as a "Netbula ONC RPC and PowerRPC user." (Milionis Decl., Ex. 33.)

In contrast, Dr. Yue provides his declaration, which states that "[o]n October 1, 2007, when I was trying to find the mailing address of Chordiant Software, Inc.'s CEO, I started to realize that [Chordiant Inc.] was probably a different company from the UK company Prime Response Ltd which had changed its name to Chordiant Software Intl Ltd." (Yue Decl. ¶ 73.) Dr. Yue further explains that "[a]fter spending so much time inquiring and investigating the situation [with Chordiant Inc.], I concluded (1) [Chordiant Inc.] was not Chordiant Software International Ltd or Prime Response Ltd; [and] (2) [Chordiant Inc.] did not have any Netbula license . . . ." (Id. ¶ 81.)

Based on the evidence showing that Netbula sent the Software to Chordiant International in the United Kingdom and Dr. Yue's declaration explaining that he did not realize Chordiant Inc. was a separate entity from Chordiant International, a reasonable jury could find that Netbula did not intend to grant Chordiant Inc. an implied license to the Software. Moreover, Defendants' evidence would not preclude a reasonable jury from finding that Netbula reasonably believed it was dealing with an existing licensee. Thus, the Court finds that genuine issues of material fact remain as to whether Chordiant Inc. possessed an implied license to use Plaintiffs' Software.

Accordingly, the Court DENIES Defendants' Motion for Summary Judgment on the ground that Chordiant Inc. possessed an implied license.[5]

**C.    Equitable Estoppel Against Plaintiffs**

In the absence of an express or implied license, Defendants contend that summary judgment is appropriate on the ground that Plaintiffs are equitably estopped from asserting copyright infringement. (Motion at 14-15.)

In the copyright context, there are four conjunctive elements to an equitable estoppel defense: (1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that his conduct be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must

---

[5] In light of the Court's finding that genuine issues of material fact exist regarding the existence of an express or implied license to Chordiant Inc., the Court need not address the parties' contentions as to whether Chordiant Inc.'s use of the Software was beyond the scope of any license.

10

detrimentally rely on the plaintiff's conduct. Hadady Corp. v. Dean Witter Reynolds, Inc., 739 F. Supp. 1392, 1399 (C.D. Cal. 1990); see also 4 Nimmer on Copyright § 13.07 (2008).

Here, based on the evidence discussed above, triable issues exist regarding the first two elements of Defendants' estoppel defense. First, there is a genuine issue of material fact as to whether Netbula knew that Chordiant Inc. was using the Software and whether Netbula intended to license the Software only to Prime Response UK and its successor corporation Chordiant International. Second, there is a genuine issue of material fact as to whether Chordiant Inc. had the right to believe that Netbula intended for Chordiant Inc. to rely on its conduct.

Accordingly, the Court DENIES Defendants' Motion for Summary Judgment on the ground of equitable estoppel.

## V.  CONCLUSION

The Court DENIES Defendants' Motion for Summary Judgment.

Dated:  July 9, 2009

JAMES WARE
United States District Judge

11

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Albert L. Sieber asieber@fenwick.com
Antonio Luis Cortes corteslaw@comcast.net
Jedediah Wakefield jwakefield@fenwick.com
Laurence F. Pulgram lpulgram@fenwick.com
Liwen Arius Mah lmah@fenwick.com
Mary Elizabeth Milionis Mmilionis@Fenwick.com

**Dated: July 9, 2009**                                   **Richard W. Wieking, Clerk**

                                                          **By:  /s/ JW Chambers**
                                                               **Elizabeth Garcia**
                                                               **Courtroom Deputy**