LAURENCE F. PULGRAM (CSB NO. 115163)
lpulgram@fenwick.com
JEDEDIAH WAKEFIELD (CSB NO. 178058)
jwakefield@fenwick.com
MARY E. MILIONIS (CSB NO. 238827)
mmilionis@fenwick.com
LIWEN A. MAH (CSB NO. 239033)
lmah@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

Attorneys for Defendants
CHORDIANT SOFTWARE, INC.,
DEREK P. WITTE, and STEVEN R. SPRINGSTEEL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETBULA, LLC and DONGXIAO YUE,<br><br>            Plaintiffs,<br><br>v.<br><br>CHORDIANT SOFTWARE, INC., a Delaware corporation; DEREK P. WITTE, an individual; and STEVEN R. SPRINGSTEEL, an individual,<br><br>            Defendants. | Case No. 5:08-cv-00019-JW (HRL)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF SCOTT HAMPTON**<br><br>Date: December 14, 2009<br>Time: 9:00 A.M.<br>Courtroom: 8, 4th Floor<br>Judge: The Honorable James Ware |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page(s)**

NOTICE OF MOTION AND MOTION ................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

FACTUAL BACKGROUND ............................................................................... 2

    A.    Overview of Netbula's Software and This Dispute ................................. 2

    B.    Overview of Chordiant Marketing Director ............................................ 4

    C.    Discovery Related to Plaintiffs' Purported Damages and Expert Testimony ........ 4

ARGUMENT ....................................................................................................... 6

I.    MR. HAMPTON'S TESTIMONY MUST BE EXCLUDED BOTH WHERE HIS OPINIONS WERE NOT DISCLOSED IN HIS REPORTS AND WHERE DISCLOSED OPINIONS ARE NOT SUPPORTED BY SUFFICIENT FACTS, DATA AND ANALYSIS ........ 6

    A.    Opinions Or Support For Them Not Disclosed In Mr. Hampton's Expert Reports Should be Excluded ........ 6

    B.    Opinions Not Based on Sufficient Facts, Data, Analysis or Reliable Methodology Must Be Excluded ........ 8

II.    MR. HAMPTON'S PROPOSED TESTIMONY AS TO DEFENDANTS' WILLFULNESS SHOULD BE EXCLUDED ........ 9

III.    MR. HAMPTON'S PROPOSED TESTIMONY AS TO CHORDIANT'S REVENUE FOR FISCAL YEARS 2000 AND 2001 SHOULD BE EXCLUDED ........ 11

IV.    MR. HAMPTON HAD NO FACTUAL BASIS OR METHODOLOGY FOR CALCULATING "CONVOYED SALES" OR INDIRECT PROFITS, AND ALL TESTIMONY ON THESE TOPICS SHOULD THEREFORE BE EXCLUDED ........ 12

V.    MR. HAMPTON'S OPINIONS ABOUT APPORTIONING CHORDIANT'S PROFITS SHOULD BE EXCLUDED, EXCEPT FOR HIS "MARKET-BASED LICENSE FEE AMOUNT." ........ 14

VI.    MR. HAMPTON DISAVOWED ANY OPINION OR EXPERTISE REGARDING NUMBER OF COPIES AND ANY FUTURE TESTIMONY SHOULD BE EXCLUDED ON THAT SUBJECT ........ 16

VII.    MR. HAMPTON HAD NO OPINION ON THE PACK SIZE OF RUNTIMES THAT CHORDIANT WOULD HAVE SOUGHT TO LICENSE FROM NETBULA AND SHOULD BE EXCLUDED ON THAT SUBJECT ........ 17

VIII.    MR. HAMPTON HAD NO OPINION ON THE APPROPRIATE PRICE OF A LICENSE FOR UNLIMITED DISTRIBUTION OF NETBULA RUNTIMES AND SHOULD BE EXCLUDED FROM TESTIFYING ON THAT SUBJECT ........ 19

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**
**(continued)**

Page(s)

IX.    MR. HAMPTON COULD NOT, AND DID NOT EVEN TRY TO, SUBSTANTIATE THAT NETBULA'S SOFTWARE MIGHT HAVE GIVEN CHORDIANT A TIME-TO-MARKET ADVANTAGE, SO HE SHOULD BE EXCLUDED FROM TESTIFYING ABOUT THAT SUBJECT ..................................... 23

CONCLUSION ............................................................................................................. 24

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**CASES**

*Boston Gas Co. v. Century Indem. Co.*,
    529 F.3d 8 (1st Cir. 2008) ................................................................................ 6

*Bourjaily v. United States*,
    483 U.S. 171 (1988) ........................................................................................ 8

*Cream Records, Inc. v. Joseph Schlitz Brewing Co.*,
    754 F.2d 826 (9th Cir. 1985) ........................................................................ 14

*Daly v. Far Eastern Shipping Co. PLC*,
    238 F. Supp. 2d 1231 (W.D. Wash. 2003) ............................................ 11, 12

*Daubert v. Merrel Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................................ 8, 10, 14, 22

*DSU Med. Corp. v. JMS Co.*,
    Ltd., 296 F. Supp. 2d 1140 (N.D. Cal. 2003) .................................................. 8

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
    886 F.2d 1545 (9th Cir. 1989) ...................................................................... 15

*Kamar Int'l, Inc. v. Russ Berrie & Co., Inc.*,
    752 F.2d 1326 (9th Cir. 1984) ...................................................................... 10

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................................ 8

*Licciardi v. TIG Ins. Group*,
    140 F.3d 357 (1st Cir. 1998) ........................................................................... 6

*Mackie v. Rieser*,
    296 F.3d 909 (9th Cir. 2002) ........................................................................ 15

*Mid-State Fertilizer Co. v. Exchange Bank of Chicago*,
    877 F.2d 1333 (7th Cir. 1989) ......................................................................... 8

*Nationwide Transp. Fin. v. Cass Info. Sys.*,
    523 F.3d 1051 (9th Cir. 2008) ...................................................................... 11

*Polar Bear Productions, Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) ........................................................................ 13

*Pugliano v United States*,
    315 F. Supp. 2d 197 (D. Conn. 2004) ........................................................... 20

*Scott v. District of Columbia*,
    246 F.R.D. 49 (D.D.C. 2007) .................................................................... 7, 12

*ZZ Top v. Chrysler Corp.*,
    70 F. Supp. 2d 1167 (W.D.Wash. 1999) ....................................................... 10

**STATUTES**

17 U.S.C. § 504 .............................................................................. 9, 10, 14

17 U.S.C. § 504(b) ........................................................................................... 1

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Page(s)

**RULES**

Fed. R. Civ. P. 26 ................................................................................................. 6

Fed. R. Civ. P. 26(a) ............................................................................................. 2

Fed. R. Civ. P. 26(a)(2)(B) ............................................................................. 5, 6

Fed. R. Civ. P. 26(a)(2)(C) ................................................................................ 11

Fed. R. Civ. P. 37(c)(1) ........................................................................................ 6

Fed. R. Evid. 104 .................................................................................................. 1

Fed. R. Evid. 403 ................................................................................................ 10

Fed. R. Evid. 702 ........................................................................................... 8, 10

Fed. R. Evid. 702(2) ........................................................................................... 10

Fed. R. Evid. 703 ................................................................................... 20, 22, 23

Fed. R. Evid. 704 ................................................................................................ 11

Local Rule 7-3 ...................................................................................................... 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on December 14, 2009 in courtroom 8 of the United States District Court, Northern District of California, San Jose Division, located at located at 280 South 1st Street, San Jose, California, at 9:00 A.M. or as soon thereafter as this matter may be heard, Defendants Chordiant Software, Inc. ("Chordiant"), Derek P. Witte, and Steven R. Springsteel (collectively "Defendants") will and hereby do move, pursuant to Rules 104, 403, and 702 of the Federal Rules of Evidence, for an order excluding certain testimony of Scott Hampton, proposed expert witness for Plaintiffs Netbula, LLC ("Netbula") and Dongxiao Yue. This motion is based upon this Notice of Motion and Motion, the Declaration of Laurence Pulgram, on all the pleadings and papers of record, and on other oral or written matters as the Court shall entertain.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs' designated expert acccountant, Scott Hampton, purports to address in his reports both Plaintiffs' actual damages and Defendants' profits under 17 U.S.C. § 504(b) arising from defendant Chordiant's sales of the accused Chordiant Marketing Director product. Although Defendants do not seek to exclude Mr. Hampton's testimony entirely, his deposition testimony has revealed that he has either performed no analysis and reached no opinion on a number of topics for which his reports purported to offer opinions, or that his purported opinion is unfounded and unsubstantiated. Defendants therefore request that the Court exercise its role as "gatekeeper" for expert testimony, and exclude the testimony and reports of Mr. Hampton on the following subjects:

o Willfulness of Defendants' allegedly infringing conduct;
o Revenue of Chordiant for fiscal years 2000 and 2001;
o Indirect profits of Chordiant Software, Inc. not attributable to the Chordiant Marketing Director product;
o Apportionment of Chordiant profits attributable to Netbula's code, other than what Mr. Hampton has described as a "market-based license fee amount";
o Number of copies of Chordiant Marketing Director distributed by Chordiant or made by the recipients;
o The size of "Packs" of licenses—e.g., 100 units, 1000 units, etc.—that Chordiant would have purchased for commercial use of Plaintiffs' runtime software in a willing buyer-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

willing seller scenario.

- o Purported pricing of Netbula RPC licenses for "unlimited" distribution of runtimes, a type of license that Netbula has never sold in its thirteen year history, and as to which its purported "offering" price cannot substantiate what a willing buyer would pay;
- o Competitive time-to-market advantage, if any, that Netbula's RPC software conferred on Chordiant Marketing Director.

Although Mr. Hampton's report or deposition testimony suggests an intention to testify on these topics, his opinions on them—if any exist—do not approach the substantiation required for presentation to the jury. In typical fashion, his opening and/or rebuttal reports mention certain subjects and imply that he will at some point offer an opinion on those subjects. Yet, his deposition made clear that Mr. Hampton has not conducted any real analysis or formed any opinion on the subjects listed above. Stating that he may have an opinion but not disclosing his opinions and analyses in his reports and/or deposition countermands Rule 26(a)'s requirement that all opinions and all bases and reasons therefor be disclosed, and its purpose of ensuring that a party receives fair and reasonable notice of the other party's positions and information in time to conduct proper discovery within the schedule set by the court. Mr. Hampton lacks any excuse for being unable to testify on these subjects about which he altogether failed to disclose opinions or analysis within the discovery period. Indeed, Mr. Hampton's paltry analysis corresponds to the scant time he has spent on this matter, not even eight hours by the time his opening report issued. Mr. Hampton is not entitled to do his work and reach new opinions after close of discovery.

In addition, for some subjects, Mr. Hampton acknowledges that he either lacks expertise or was not asked by his client to provide analysis or opinion. Accordingly, Mr. Hampton should be barred from later testifying about those subjects.

## FACTUAL BACKGROUND

### A. Overview of Netbula's Software and This Dispute.

In 1996, Netbula, LLC was created by Dongxiao Yue, its sole officer and employee, to market a form of Remote Procedure Call ("RPC") software that he wrote. Dkt. No. 138, Fourth Amended Complaint ("FAC") ¶ 11; Pulgram Decl. ¶ 14, Ex. 14 (6/27/07 Deposition of Dongxiao Yue) at 59:17:60:1, 69:3-70:14. RPC software is one method of facilitating communication

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

between computer clients and servers. Pulgram Decl. ¶ 15, Ex. 15 (10/29/09 Deposition of Dongxiao Yue) at 595:3-5. As Netbula has stated, "the *de facto* RPC standard on UNIX systems" is ONC RPC, "an open source RPC framework developed by Sun Microsystems."[1] Netbula adapted or "ported" Sun's ONC RPC for Java and Microsoft Windows environments and has sold an "ONC RPC" branded software product for Windows and a "JavaRPC" branded software product for Java.[2] As of 2000, Netbula was one of various suppliers of Windows and Java versions of ONC RPC software. Pulgram Decl. ¶ 16, Ex. 16 (9/29/09 Deposition of Dongxiao Yue) at 354:12-17.

Netbula's RPC software has two parts: (1) a Software Development Kit ("SDK") that consists of software tools that allow licensed programmers to develop their own applications using RPC, and (2) "runtime software" that must be present for the applications developed with the SDK to work. Dkt. No. 97, at 2; Fourth Amended Complaint ("FAC") ¶ 19. Netbula has historically licensed each of these parts. Dkt. No. 97, at 2; FAC ¶ 29. Chordiant's Marketing Director ("CMD") software made use of the runtime software. Dkt. No. 97, at 2. Netbula received license payments from Chordiant Software International, Ltd. (Chordiant's wholly owned subsidiary) in 2004 and its predecessor named Prime Response, Ltd. in 2000 for use of the SDK and distribution of the runtime software. Dkt. No. 97, at 2–3. In each instance, the license was for an SDK and a "1000 Pak" of licenses for runtimes, which Chordiant or its predecessors were to redistribute to Chordiant's customers with their software. Pulgram Decl. ¶¶ 5-6, Exs. 4 & 5.

Plaintiffs contend that any use of Netbula's development tools by Chordiant (as opposed to its affiliates or predecessors), and any distribution of Marketing Director with the Netbula runtime software are not covered by those licenses. In its Amended Disclosures, served August 25, 2009, Plaintiffs claimed $18,000,000 of actual damages (in the form of lost licensing revenues) and $220,000,000 in Chordiant's revenues from sales of CMD. Pulgram Decl. ¶ 4, Ex. 3 (Plaintiffs' Amended Disclosures), at 13. Mr. Hampton's expert reports do not adopt these

---

[1] *Id.* ¶ 2 & Ex. 1 (Sun RPC for Windows webpage, at http://web.archive.org/web/20000823023347/www.netbula.com/oncrpc/).

[2] *Id.* ¶ 3 & Ex. 2 (www.netbula.com home page, at http://web.archive.org/web/20001001230112/netbula.com/).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    figures, and do not provide any calculation of actual damages to Netbula or Chordiant's purported

2    profits, but do identify revenues totaling $97,990,848 for sale of CMD from 2002 through mid-

3    2008, see Pulgram Decl. ¶ 9, Exs. 8 (Hampton "Opening Report") ¶ 1 & 9 (Hampton "Rebuttal")

4    ¶ 1Opening Report ¶ 28 & Ex. E.1., as well as an additional $104,685,017 in purported sales in

5    2002 and 2003, see Opening Report ¶ 30 & Ex. F.1., from a different Chordiant product, "ICIM,"

6    that did not use Netbula's software in any form at any time. Pulgram Decl. ¶ 17, Ex. 17

7    ("Hellewell Depo.") at 73:5:12; 123:14-22.

8         Chordiant denies that it infringed, and disputes Plaintiffs' damages claims. Chordiant

9    points out that it is undisputed that in 2007 Chordiant successfully replaced Netbula's software

10   code with a "freeware" alternative that was readily available and functioned perfectly well, with

11   only modest effort required. Dkt. No. 106 (Declaration of Oliver Wilson) ¶ 11. Plaintiffs' claims

12   that a willing-buyer and willing-seller purportedly would have agreed to exorbitant royalty rates

13   cannot be squared with the fact that Chordiant could have obtained the same functionality from

14   other sources for exponentially less.

15   **B.    Overview of Chordiant Marketing Director.**

16        CMD is not in the same market as Plaintiffs' software, and Chordiant does not compete

17   with Netbula. Rather, CMD is a specialized marketing campaign management application

18   designed to automate and streamline the processes required to plan, define, execute, and analyze

19   sophisticated marketing campaigns. *Id.* ¶ 12. CMD became one of Chordiant's offerings after

20   Chordiant acquired Prime Response in 2001. *Id.* ¶ 4. Because of the specialization of the CMD

21   application, a typical end user company would have relatively few persons in the firm that would

22   utilize the application. *Id.* ¶ 12. In addition, although some sort of communications protocol was

23   necessary for CMD to function, Mr. Hampton was unable to identify any element in which

24   Netbula's particular implementation of RPC, as opposed to the various available alternatives that

25   were publicly available, contributed to the value of CMD's product. Hampton Depo. at 45:3-19.

26   **C.    Discovery Related to Plaintiffs' Purported Damages and Expert Testimony.**

27        On November 20, 2008, the Court issued a scheduling order setting June 29, 2009 and

28   July 13, 2009 as the last day for the parties' opening and rebuttal expert disclosures, respectively,

DEFENDANTS' MOTION TO EXCLUDE          -4-        CASE NO. 5:08-CV-00019-JW (HRL)
HAMPTON TESTIMONY

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  based on an August 31, 2009 close of all discovery. Dkt. No. 97. On May 29, 2009, the Court

2  extended the close of all discovery to October 30, 2009, as stipulated by the parties. Dkt.

3  No. 137. On September 2, 2009, the parties stipulated to extend further the deadline for each

4  party to make opening expert disclosures under Rule 26(a)(2)(B) to October 2, 2009, and to

5  extend the deadline for each party to make rebuttal expert disclosures to October 16, 2009. Dkt.

6  No. 143. This schedule allowed the parties to continue to complete discovery by the October 30,

7  2009 deadline the Court had previously set. It also accommodated both parties by allowing each

8  more time to prepare their expert reports, without prejudice to either party, as the extensions were

9  simultaneous, mutual, and prior to any expert reports having been served. The Court issued an

10  order to this effect on September 21, 2009. Dkt. No. 151.

11       On October 2, 2009, Plaintiffs served a disclosure under Rule 26(a)(2)(B) for Scott

12  Hampton, an accountant, as one of their experts. Pulgram Decl. ¶ 9. Plaintiffs had disclosed their

13  intention to retain Mr. Hampton (in order to be able to reveal to him Chordiant's confidential

14  information) as early as August 7, 2009. *Id.* ¶ 7, Exh. 6.



18  *Id.* ¶ 9, Exs. 8

19  (Hampton "Opening Report") ¶ 1 & 9 (Hampton "Rebuttal") ¶ 1.

20       Mr. Hampton submitted an opening damages report on October 2, 2009 and a rebuttal

21  report addressing Dr. Lynde's opening report on October 16, 2009. *Id.* Defendants then deposed

22  Mr. Hampton on October 28, 2009 to ensure compliance with the October 30, 2009 close of

23  expert discovery. *Id.* ¶¶ 9-10, Ex. 10 ("Hampton Depo."). By the time of his deposition, Plaintiffs

24  had already deposed Dr. Lynde on October 26, 2009 and had ample time to review Dr. Lynde's

25  opening and rebuttal reports, which were served on October 2 and October 16, 2009 respectively

26  as required by the Court's September 21, 2009 stipulated order. *Id.* ¶ 12.

27       After his deposition, Mr. Hampton served a third report on November 3, 2009, which he

28  called a "Supplemental Report" and which purported to correct an error in a table that had been

1    included as an exhibit to his Rebuttal. *Id.* ¶ 13, Exh. 13.

2        This Court's scheduling orders of May 29 and September 21, 2009 established the

3    deadline for hearing dispositive motions and motions to exclude any expert or any proposed

4    expert testimony on December 14, 2009. Dkt. No. 137 (setting December 14, 2009 as the

5    stipulated last hearing date for dispositive motions); Dkt. No. 151 (setting December 14, 2009 as

6    the stipulated last hearing date for motions to exclude experts or proposed testimony).

7    Accordingly, under Local Rule 7-3, the deadline for filing such motions is November 9, 2009, a

8    mere ten days after the October 30, 2009 close of all discovery.

9                                **ARGUMENT**

10   **I.    MR. HAMPTON'S TESTIMONY MUST BE EXCLUDED BOTH WHERE HIS**
          **OPINIONS WERE NOT DISCLOSED IN HIS REPORTS AND WHERE**
11        **DISCLOSED OPINIONS ARE NOT SUPPORTED BY SUFFICIENT FACTS,**
          **DATA AND ANALYSIS.**
12
          **A.    Opinions Or Support For Them Not Disclosed In Mr. Hampton's Expert**
13              **Reports Should be Excluded.**

14        Federal Rule of Civil Procedure 26(a)(2)(B) requires an outside expert's report to contain

15   a "complete statement of all opinions the witness will express and the basis and reasons for

16   them." Rule 37(c)(1) allows exclusion of expert witness testimony where a party failed to provide

17   proper disclosure through the report required by Rule 26(a)(2)(B). Accordingly, a district court

18   may properly prevent an expert from introducing new opinions or supplementing his expert report

19   after the expiration of the deadline set by the court. *See Boston Gas Co. v. Century Indem. Co.*,

20   529 F.3d 8, 17 (1st Cir. 2008) (affirming exclusion of supplemental report, even though issued

21   months before trial, despite possibility of other party deposing the expert about new opinions);

22   *see also Licciardi v. TIG Ins. Group*, 140 F.3d 357, 366 (1st Cir. 1998) (excluding expert

23   testimony that "departed from the general scheme of the report" in that it "both directly

24   contradicted a portion of his report and went into an entirely new area").

25        In this action, the Court's November 20, 2008 order reinforced the mandate of Rule 26 by

26   expressly placing the following limitation on testimony by expert witnesses:

27        Unless the parties enter into a written stipulation otherwise, upon timely objection,
          *an expert witness shall be precluded from testifying about any actions or opinions*
28        *not disclosed prior to the expert's deposition.* This is to ensure that all factual

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  material upon which expert opinion may be based and all tests and reports are
2  completed prior to the expert deposition.

3  Docket No. 97 (Scheduling Order) ¶ 8 (emphasis added).  Further, this Court's scheduling orders

4  set the filing of motions to exclude experts or portions of their opinions immediately after the

5  close of discovery, consistent with the need to provide full disclosure of all opinions prior to

6  depositions. Dkt. Nos. 137 & 151.

7      Plaintiffs have thus known for a full year that Mr. Hampton would be precluded from

8  testifying about any opinions not disclosed prior to his deposition. Dkt. No. 97 ¶ 8.  Knowing this,

9  the parties twice stipulated to extend the close of discovery to ensure completion of expert

10  discovery by both sides. Dkt. Nos. 137 & 143.  A similar circumstance is found in *Scott v.*

11  *District of Columbia*, 246 F.R.D. 49, 52 (D.D.C. 2007), where the parties, as here, stipulated to an

12  extended period for expert discovery.  The court thereafter held that one expert's failure to

13  disclose opinions within the discovery period unfairly forced the other party to complete

14  discovery and prepare for depositions without benefit of full expert disclosure.  Likewise, here it

15  would prejudice Defendants if Mr. Hampton were not held to the opinions disclosed within the

16  already extended period that the parties agreed to and that the Court ordered.  With the deadline

17  to file dispositive and expert motions being November 9, 2009, Defendants diligently sought to

18  meet both that deadline and the October 30, 2009 close of discovery. To respect the Federal Rules

19  and this Court's orders, as well as to further the efficient and just resolution, Mr. Hampton must

20  be precluded from offering any additional testimony or opinions that he did not disclose prior to

21  October 30, 2009.

22      This is all the more fitting because Mr. Hampton had ample time to complete his reports.

23  Mr. Hampton was identified by Plaintiffs as a recipient of confidential information on August 7,

24  2009, ████████████████████████████████████████████████████

25  ██████████████████████████████████ on his work prior to his Opening

26  Report (the remainder being performed by staff), he had no shortage of time available to perform

27  any work he wished before his deposition. *See id.*, Ex. 7 at 3.

28

**B.      Opinions Not Based on Sufficient Facts, Data, Analysis or Reliable Methodology Must Be Excluded.**

Testimony from an expert witness with "scientific, technical, or other specialized knowledge" may be allowed only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. A trial judge acts as a "gatekeeper" to decide whether proffered expert evidence is admissible at trial. *DSU Med. Corp. v. JMS Co.*, Ltd., 296 F. Supp. 2d 1140, 1146 (N.D. Cal. 2003) (excluding damages expert testimony); *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-593 (1993). Testimony should not be admitted if an expert's reasoning or methodology is not "valid or cannot be properly applied to the facts at issue." *Daubert*, 509 U.S. at 592-593.

Speculative testimony and testimony insufficiently tied to the facts of a particular case must be excluded as unreliable. *See id.* at 597; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). An "expert" who proposes to impart an opinion that has little logical or factual foundation must not be allowed to testify lest the trier of fact be misled by his resume and credentials. *See Daubert*, 509 U.S. at 595 (noting that expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it, and that due to this risk, the judge should exercise more control over experts than over lay witnesses). If the expert's conclusions appear to conflict with economic reality or make no economic sense, the proponent of the expert must come forward with a more persuasive showing to demonstrate that the expert's opinions have a suitably sound foundation. *Mid-State Fertilizer Co. v. Exchange Bank of Chicago*, 877 F.2d 1333, 1339-40 (7th Cir. 1989) (warning that judges "should not be buffaloed by unreasoned expert opinions"). The proponent of the testimony has the burden of establishing admissibility by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1988).

As discussed further below, Mr. Hampton's proffered opinions in numerous respects breach the *Kumho/Daubert* line. Mr. Hampton repeatedly has announced in his reports speculative generalities about subjects which, when inquired into at deposition, have no factual basis and have been subject to no analysis whatsoever. His casual mention in his reports of such

1  subjects as willful infringement, convoyed sales, or time-to-market advantage from infringement

2  do not allow speculation about these subjects to be presented to the jury, given the obvious

3  potential to mislead and the absence of any genuine analysis of them by Mr. Hampton.

## II. MR. HAMPTON'S PROPOSED TESTIMONY AS TO DEFENDANTS' WILLFULNESS SHOULD BE EXCLUDED.

6  Mr. Hampton's gratuitous reference to "willfulness" should be excluded as legally

7  irrelevant, outside his subject matter expertise, and highly prejudicial. Mr. Hampton first

8  █████████████████████████████████████████████████████████████████

9  ████████████████ *See* Rebuttal ¶ 9. His Rebuttal refers to the fact that Chordiant was

10 █████████████████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████ At deposition,

13 however, Mr. Hampton admitted that it is █████████████████████████████████

14 ████████████████████████████████████████████████████ Hampton

15 Depo. at 61:6-13. Further, when asked to explain what impact willfulness has on the method of

16 calculating, Dr. Hampton suggested ████████████████████████

17 ██████████████████████████████████████████

18 ██████████████████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████████████████████

24 *Id.* at 62:7-22. Any testimony by Mr. Hampton regarding willfulness must be excluded for three

25 reasons.

26 First, Mr. Hampton's suggestion that "willfulness" has any role to play in the jury's

27 deliberation in this case is wrong as a matter of law. Section 504 of the Copyright Act allows

28 consideration of willfulness only when determining statutory damages. 17 U.S.C. § 504. As set

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

forth in Defendants' motion for summary judgment on statutory damages and attorneys fees,

Plaintiffs are ineligible for statutory damages here because the alleged infringement commenced

long before registration of the copyrights at issue.[3] Section 504 does not mention willfulness in

the context of plaintiff's actual damages or disgorgement of defendants' profits. 17 U.S.C. § 504.

Moreover, the Ninth Circuit has rejected the proposition that willfulness may automatically deny

a willful infringer deductions from revenue in estimating its profits. *Kamar Int'l, Inc. v. Russ*

*Berrie & Co., Inc.*, 752 F.2d 1326, 1331 (9th Cir. 1984) (despite willfulness allowing enhanced

statutory damages, under 1909 Copyright Act, calculation of profits turned on customary analysis

of whether expenses were "necessary" to production of allegedly infringing product); *ZZ Top v.*

*Chrysler Corp.*, 70 F. Supp. 2d 1167, 1168-69 (W.D.Wash. 1999) (even in context of willful

infringement "neither the language of the statute, its legislative intent, nor the relevant case law

requires or justifies prohibiting defendant from putting on evidence regarding its overhead

costs"). Because willfulness is irrelevant to the issues here, Mr. Hampton's desire to tell the jury

that it has discretion to consider willfulness in calculating Defendants' profits would be

prejudicial, inflammatory, and based on a principle or method inconsistent with applicable law.

*See* Fed. R. Evid. 702(2).

Second, Mr. Hampton's opinion would not "assist the trier of fact to understand the

issue," because, as an accountant, he offers no expertise on the subject of the existence of

willfulness or its impact. *See* Fed. R. Evid. 702. Worse, such an unsubstantiated opinion from an

expert designated for other topics has great potential to confuse and mislead the jury. *See* Fed. R.

Evid. 403; *Daubert*, 509 U.S. at 595. By Mr. Hampton's own words, █████████████████

██████████████████████████████████████████████████ Hampton Depo.

at 62:6–22. In addition, Mr. Hampton is neither an expert on licensing nor the customs and

practices typical in the software industry, so he can provide no useful context to assist the trier of

fact to understand Defendants' conduct. *Id*. at 16:12-17. Indeed, Hampton admits that

████████████████████████████████████████████████████████

---

[3] Apparently recognizing that it has no right to statutory damages, Plaintiffs have not disclosed
any statutory damages. *See* Pulgram Decl., Ex. 3 (Plaintiffs' Amended Disclosures), at 13.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

[REDACTED] Mr. Hampton has no expertise in determining what Chordiant believed, and he may not wander outside his area of expertise in order to toss in an assertion on willfulness. This is especially true given that, if relevant at all, willfulness would constitute the ultimate legal issue. *See Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (upholding exclusion of expert opinion on ultimate legal issue of whether parties' actions were "wrongful" or "intentional" under the law and distinguishing FRE 704).

Third, Mr. Hampton's introduction of willfulness testimony should also be excluded as not being properly within the scope of a rebuttal report, particularly since Dr. Lynde's opening report said nothing about willfulness and thus provided nothing to rebut on that topic. *See Fed. R. Civ. P.* 26(a)(2)(C) (limiting expert reply to evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party"); Docket No. 97 (Scheduling Order) ¶ 7 (same); *see also Daly v. Far Eastern Shipping Co. PLC*, 238 F. Supp. 2d 1231, 1240 (W.D. Wash. 2003) (finding exclusion of purported expert "rebuttal" appropriate where "rebuttal" did not address opposing expert's opinions, but rather raised new opinions).

For these reasons, Mr. Hampton should be precluded from offering any testimony on willfulness.

## III.  MR. HAMPTON'S PROPOSED TESTIMONY AS TO CHORDIANT'S REVENUE FOR FISCAL YEARS 2000 AND 2001 SHOULD BE EXCLUDED.

[REDACTED]

----

[4] The Opening Report also stated: [REDACTED] Opening Report ¶ 18. The Exhibit E.1. referred to does not include [REDACTED]

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Id.* ¶ 31.

However, there is no additional sales data to be made available, as Chordiant did not even acquire the Prime Response business (and the CMD software) until midway through 2001, and does not ██████████████████████████████████████████████████ Pulgram Decl. ¶ 18, Ex. 18 (Kitchen deposition transcript) at 17:8-13.

In his Rebuttal, Mr. Hampton acknowledged that Dr. Lynde's opening report *did* analyze ████████████████████████████████████████████████████████████████████████████ *See* Rebuttal ¶¶ 17-18.

When asked about revenue for 2000 and 2001 during his deposition, Mr. Hampton made it clear that ████████████████████████████████████████████████████████ ████████████████████ ████████████████████████████████████████████████████████████████

Hampton Depo. at 219:17-23.

Thus by Mr. Hampton's admission, though he could have used available information to make an estimate, Plaintiffs did not ███████████████████████████████████████████ Hence, no opinion existed before his deposition—or, for that matter after, when Mr. Hampton submitted his "Supplemental Report." Given that Mr. Hampton neither calculated revenue numbers for 2000 and 2001 nor provided any methodology for how he might calculate them, Mr. Hampton may not proffer later testimony on this subject to Defendants' prejudice.[5] *See Scott*, 246 F.R.D. at 52.

## IV. MR. HAMPTON HAD NO FACTUAL BASIS OR METHODOLOGY FOR CALCULATING "CONVOYED SALES" OR INDIRECT PROFITS, AND ALL TESTIMONY ON THESE TOPICS SHOULD THEREFORE BE EXCLUDED.

Mr. Hampton's references to indirect profits seek to more than double the purported amount of revenues earned by Chordiant from infringement, based on high level references to

---

[5] Notably, Dr. Lynde calculated revenue for 2001 from Chordiant's public filings, which were equally accessible to Mr. Hampton. Pulgram Decl. ¶ 12, Ex. 11 ("Lynde Opening Report.") ¶ 28.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

potential "convoyed sales" of non-infringing products that are utterly unsubstantiated. "To recover indirect profits, [p]laintiff must establish a causal relationship between the infringement and the profits generated indirectly from such infringement." *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 711, 714 n.10 (9th Cir. 2004); Ninth Circuit Model Civil Jury Instructions § 17.24 (Comment). If the plaintiff is unable to proffer some evidence that certain profits were at least partially caused by the infringement, the plaintiff has not met the "fundamental standard" of showing the required causal relationship. *See Timex*, 384 F.3d at 711.

Mr. Hampton alluded to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮but he failed to establish any causal relationship with CMD. After stating a number in his opening report for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*i.e.*, CMD), he then stated: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Opening Report ¶ 27. The non-CMD product cited was Chordiant's ▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 29. Mr. Hampton claims in his report that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮would **more than double** the revenues at issue. Yet his report makes no effort to quantify what part of those revenues might somehow be driven by sale of CMD. *Id.*

At deposition, Mr. Hampton acknowledged that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Hampton Depo. at 225:12-17. Worse, Mr. Hampton acknowledged that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮c▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Id.* at 224:2-21. Mr. Hampton further testified that for the single example included in his report—

███████████████████████████ *Id.* at 226:21-227:1. When asked whether he could testify as to any dollar amount of convoyed sale, Mr. Hampton answered: ████████████████████████████

███████████████████████████ *Id.* at 227:2-5. His Rebuttal report similarly had failed to explain ████████████████

Mr. Hampton's testimony as to indirect sales must be excluded, since he did not study, much less form an opinion on, that subject prior to this deposition. Further, any reference to this subject in his reports relies merely on bald assertion of an association of CMD with other Chordiant products, when Mr. Hampton clearly had no factual basis for opining on that association. An assertion that facts that might add████████████████████ ████████ without more, cannot constitute either a sound factual basis or application of any methodology whatsoever. Accordingly, Mr. Hampton should be excluded from testifying on the revenues or profits not directly attributable to CMD. *See Daubert*, 509 U.S. at 595.

## V. MR. HAMPTON'S OPINIONS ABOUT APPORTIONING CHORDIANT'S PROFITS SHOULD BE EXCLUDED, EXCEPT FOR HIS "MARKET-BASED LICENSE FEE AMOUNT."

In addition to "actual damages suffered as a result of the infringement," a prevailing plaintiff may recover those profits of the defendant that are "attributable to the infringement" and not taken into account in determining plaintiff's actual damages. 17 U.S.C. § 504; *see also* Ninth Circuit Model Civil Jury Instructions §§ 17.22, 17.24. In a case such as this, where the copyrighted work is merely one part of a larger product, some portion of the defendant's profit may be attributable to factors other than the defendant's having copied or infringed the copyrighted work. Ninth Circuit Model Civil Jury Instructions § 17.24; *see also Cream Records,*

─────────────────────────

[6] In fact, the unrebutted evidence is that ███████████████████ ulgram Decl. ¶ 17, Ex. 17 ("Hellewell Depo.") at 73:5:12; 123:14-22.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  *Inc. v. Joseph Schlitz Brewing Co.*, 754 F.2d 826, 828-29 (9th Cir. 1985) (noting appropriateness

2  of apportionment where not all of defendant's profits can be attributed to the infringement). The

3  apportionment must be reasonable and just, based on "non-speculative evidence." *Frank Music*

4  *Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1549 (9th Cir. 1989); *Mackie v. Rieser*, 296

5  F.3d 909, 916 (9th Cir. 2002).

6        In the present case, Dr. Lynde provided an apportionment of profits based on a

7  comparison of what it would have cost Chordiant itself to develop comparable RPC functionality

8  ████████and what Chordiant expended on CMD research and development overall. Pulgram

9  Decl. ¶ 12, Ex. 11("Lynde Opening Report.") ¶ 40. Dr. Lynde thus opined that ████████████

10  ████████████████████████████████████████████████ *Id.*

11  He further opined that this amount was consistent with the ████████████████████████

12  ████████████████████████████ *Id.* ¶ 12, Ex. 12 ("Lynde Rebuttal Report") ¶ 43.

13        In response to Dr. Lynde's opinion, Mr. Hampton's Rebuttal report offered no

14  "████████████████████████████ Hampton Depo. 259:25-260:17

15  (acknowledging Hampton did no such analysis). However, after rejecting Lynde's approach, the

16  Rebuttal did offer one method for determining apportionment:

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  Rebuttal ¶ 8.[7] Mr. Hampton labeled this approach as a ████████████████████

22  "████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████ "████" *Id.; see also*

25  Hampton Depo at 97:4-12; 259:25-260:17.

26

27  [7] Defendants do not object to Mr. Hampton testifying about his critique of Dr. Lynde's cost-based
apportionment methodology. *Id.* What Defendants object to is any testimony as to any alternative

28  methodology or quantification not previously provided by Mr. Hampton.

At deposition, Mr. Hampton identified what he described as an alternative potential approach to apportionment: █████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████." Hampton Depo. at 89:2-25. This is, of course, no apportionment at all—0% of profits would be deemed attributable to anything in CMD other than Netbula's product, ████████████████████Faillace Decl. ¶ 16.

Other than the two alternatives above, Mr. Hampton proffered no ██████████████ █████████████████████████████████████████████Hampton Depo. at 65:20-24; 89:2-91:4; 259:25-260:17. Mr. Hampton did not analyze or opine ████████████ ███████████████████████████████████*Id.* at 263:14-21. He also did not assess whether Netbula's components in CMD █████████████████████ ███████████████████████████████*Id.* at 261:13-17. Nor did he know of any aspect of Netbula's expression of RPC that ██████████████████████████ █████████████████e. *Id.* at 44:10-45:7.

Mr. Hampton is not entitled to begin to study these subjects and develop any new, heretofore undisclosed methodology for apportioning profits between infringing and non-infringing aspects after discovery is closed. Because he has not disclosed any opinions other than saying that apportionment could be based on either all CMD profits or the "market-based license fee amount," Mr. Hampton should be precluded from testifying or offering opinions about any other qualitative or quantitative measure of apportioning CMD profit to the allegedly infringed Netbula software.

## VI. MR. HAMPTON DISAVOWED ANY OPINION OR EXPERTISE REGARDING NUMBER OF COPIES AND ANY FUTURE TESTIMONY SHOULD BE EXCLUDED ON THAT SUBJECT.

One component of what Mr. Hampton labeled as his ████████████████████ ████████████████████████████████████████████ Rebuttal ¶ 4; Hampton Depo. at 64:7-15. To calculate damages, Mr. Hampton proposed to multiply the number of █████████████████████████████████████████████████Rebuttal ¶¶ 11, 12.

Mr. Hampton's Rebuttal stated that he " ███████████████████████████████

█████████████████████████████████████████████████████████████████████, Rebuttal

¶ 11. The Rebuttal also purports to reserve the right to ████████████████████████████

████████████████████████████████████ if either Chordiant or his own

research provided such an estimate at a later date. *Id.* However, his reports said nothing about the

methodology underlying his reported incomplete research.

His deposition under oath made clear why he was silent on his research—he had actually

not undertaken any investigation or analysis of this issue:



Hampton Depo. at 206:2-207:4 ███████████████████ to the question "Have you done

anything else to try to estimate the number yourself?") .

Mr. Hampton acknowledged that he had neither analyzed or opined on ████████████████

████████████████████████████ There could hardly be a more stark justification for

excluding expert testimony when the expert not only formed no opinion, but stated that he is not

the proper authority to testify on the subject. Accordingly, Mr. Hampton should be precluded

from providing any testimony or opinion about the number of allegedly infringing copies

distributed by Chordiant or made by its customers.[8]

## VII.  MR. HAMPTON HAD NO OPINION ON THE PACK SIZE OF RUNTIMES THAT CHORDIANT WOULD HAVE SOUGHT TO LICENSE FROM NETBULA AND SHOULD BE EXCLUDED ON THAT SUBJECT.

A prevailing plaintiff in a copyright infringement case may recover an amount equal to the

"reduction of the fair market value of the copyrighted work," which is the amount "a willing

---

[8] This would not preclude Dr. Hampton from mechanically multiplying numbers for his "price-times-units calculation," but only from attesting himself to the number of units required.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1 buyer would have been reasonably required to pay a willing seller at the time of the infringement

2 for the actual use made by the defendant of the plaintiff's work." Ninth Circuit Model Civil Jury

3 Instructions § 17.23. "That amount also could be represented by the lost license fees the plaintiff

4 would have received for the defendant's unauthorized use of the plaintiff's work." *Id.* As

5 described above, in the present case Mr. Hampton has opined that this damage amount could be

6 calculated by ███████████████████████ Rebuttal ¶¶ 11, 12.

7     As to distribution of Netbula runtimes, Mr. Hampton opined that ███████████

8 ██████████████████████████████████████████████████████████████

9 ████████████████████████████████████████ Opening Report ¶ 25.

10 Mr. Hampton compiled price averages for "pack" sizes because ██████████████

11 ████████████████████████████████████████████████████

12 ████████████ Hampton Depo. at 127:9-128:4. The choice of pack size Chordiant would

13 have purchased determines price: According to Mr. Hampton, the 1000-pack licenses that

14 Netbula sold were at most ███████████████████Hampton Depo. at 201:5-6. Smaller

15 packs (*e.g.*, 10, 20, 100) sold for █████████████████████Rebuttal, Exs.

16 A.1. & B.1; Supplemental Report, Exs. A.1. & B.1. The actual purchases of licenses by

17 Chordiant's affiliated entities in 2000 and 2004 were purchases of 1000 packs at the lower prices.

18 Pulgram Decl. ¶¶ 5-6, Exs. 4 & 5.

19     Just as Mr. Hampton had no opinion as to total number of copies made, he also did not set

20 forth any opinion as to which pack size Chordiant would have purchased from Netbula. Tellingly,

21 rather than taking any position, Mr. Hampton simply listed what he calculated as a ███████

22 ████████████Supplemental Report, Exs. A.1. & B.1. He explained, "█████████

23 █████████████████████████████████████████████

24 ██████" Rebuttal ¶ 12. In his deposition, he further acknowledged he had no expertise in

25 knowing what ██████████████████████████████████

26 ████████████████████████████████████████████

27 ████████████████████████████████████

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  Hampton Depo. at 132:8-14; *see also id.* at 129:20-130:4.

2         Given Mr. Hampton's lack of expertise with what quantity a manufacturer of commercial

3  software would be willing to purchase from Netbula, and his failure to provide any opinion on

4  this subject to date, Mr. Hampton should not be providing any testimony as to the pack size a

5  willing buyer in Chordiant's circumstance would have chosen.  His testimony on packs should be

6  limited to the ██████████████████████████████████████ nd disclosed in Exhibits

7  A.1. and B.1 of his Supplemental Report.

8  **VIII.**  **MR. HAMPTON HAD NO OPINION ON THE APPROPRIATE PRICE OF A**
   **LICENSE FOR UNLIMITED DISTRIBUTION OF NETBULA RUNTIMES AND**
9  **SHOULD BE EXCLUDED FROM TESTIFYING ON THAT SUBJECT.**

10         As an alternative to purchase of "packs" of runtime licenses for distribution, Netbula has

11  hypothesized that Chordiant could have purchased a license for an unlimited number of runtimes

12  and that damages could be based on the price of such an "unlimited" license. Pulgram Decl. ¶ 4,

13  Ex. 3.  But unlike licenses for packs, where there exists an actual history of sales prices agreed

14  upon by customers (including Chordiant's affiliates), Netbula has never sold ██████████████

15  ██████████████████████████ *See* Hampton Depo. at 112:25-113:3.  Rather, Netbula had

16  only offered such a license on its website, without any list price prior to the third quarter of 2005,

17  when it added exorbitant "list prices" in the millions of dollars during its disputes with Bindview

18  and Sun. *See* note 10, *infra.*  No one, to Mr. Hampton's knowledge, ever ██████████████

19  ██████████ Hampton Depo. at 116:11-19; 118:4-11.

20         Mr. Hampton acknowledged that, in this absence of any actual sales, to determine an

21  appropriate price for a damages calculation would require performing analysis of a hypothetical

22  ████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████

25  ██████ *Id.* at 111:15-112:20.  Mr. Hampton also acknowledged at deposition that he has *not*

26  performed ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████ and had reached no

28  conclusion on what that price would be.  *Id.* at 113:22-114:6; 118:14-119:11.  Because

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Mr. Hampton had formed no opinion on this subject, the Court should exclude any later testimony to an opinion not offered before his deposition.

In addition, Mr. Hampton should also be precluded from testifying about the prices offered by Netbula, as their viability is entirely unsubstantiated (indeed, contradicted by) the record, as well as unnecessary to any opinion he has to offer. In his Opening Report, Mr. Hampton mentioned that ███████████████████████████████████████ ██████████████████████████ pening Report ¶ 25 (emphasis in original).[9] These purported prices, and Mr. Hampton's reliance on them, make for a classic example of garbage in, garbage out, and they cannot be reasonably relied on as prices by an expert. *See* Fed. R. Evid. 703 (requiring facts and data to be of a type reasonably relied upon by an expert); *Pugliano v United States*, 315 F. Supp. 2d 197, 200 (D. Conn. 2004) (noting "judicial responsibility" to reject expert testimony if reliance on facts and data is unreasonable).

The numbers on their face make no economic sense, being 100,000% higher than any accepted price for Netbula's largest runtime pack, the 1000-pack, ███████████████████ ██████ Hampton Depo. at 201:5-6. Mr. Hampton himself acknowledged that it would be unreasonable to expect Chordiant to pay ██████████████████████████████ ████████████████████████████ *Id.* at 258:8-259:23. Hampton also had no dispute with Dr. Lynde's calculation that ████████████████████████████████ █████████████ *Id.* at 21:16-20. There is thus no support for any contention that Chordiant would pay over 200 times more than this amount for a license fee. Consistent with this fact, Mr. Hampton testified that he was not aware of ██████████████████████████████ Netbula license, at any time. *Id.* at 34:20-22. As such, it would be inherently unreasonable for an expert to view an offer of ██████████████████████ *Id.* at 112:25-113:8; Rebuttal Exs. A.1. & B.1.

Furthermore, Mr. Hampton admitted in deposition that he had not investigated the

---

[9] After his deposition, Mr. Hampton submitted a supplemental report purporting to correct his "mistake" in placing the unlimited license offers in his exhibits of average prices. Pulgram Decl. ¶ 13.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

reasonableness of ███████████████████████████████████████████████████

████████████████████—even though they were orders of magnitude larger than the

biggest ███████████████████████████████████████████████Hampton Depo. at

166:10-167:8. In a candid moment, even Mr. Hampton acknowledged a certain arbitrariness about

█████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*Id.* at 166:3-9.

     Mr. Hampton further acknowledged that, in determining what credibility to give Netbula's

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *Id.* at

154:11-18. [10] He did not know how long █████████████████████████████or

whether there was ever ███████████████████████████████████████

Hampton Depo. at 146:6-12; 148:23-149:1. At his deposition Mr. Hampton was confronted with

an e-mail offer Netbula sent to another customer, ███████████████████████████████

████████████████████████████████████████████████████████

████████████rejected as too high. *Id.* at 156:6-160:17. Hampton did not recall ever learning about

the rejection of that ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████at 160:13-17.

     Moreover, in his deposition, Mr. Hampton also admitted that mere offers would not

determine █████████████████████████████████████████████

████████████████████████let alone at the extraordinary prices he emphasized in his

---

[10] Netbula posted these unreasonable prices on its webpages during the approximate period when
Netbula ██████████Pulgram Decl. ¶ 16, Ex. 16 (9/29/09 Yue deposition) at 440:11-20, 444:12-
445:15; 450:15-24; 456:10-457:16, 458:7-459:20.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  Opening Report:



6  Hampton Depo. at 112:25-113:8. Thus, for Mr. Hampton to announce the prices Netbula offered

7  admittedly cannot supplant the need for an analysis Mr. Hampton has not performed.

8      After his deposition, Mr. Hampton served a supplemental report that removed the

9  ████████████████ from his rebuttal report exhibits. Pulgram Decl. ¶ 13, Ex. 13

10 ████████████████████████████████████████████

11 ████████████████████████ He did not, however, amend his

12 Opening Report to remove mention of the unsupported ████████████████ the

13 unlimited runtime licenses.

14      Mr. Hampton should not be allowed to present these offers to the jury as bearing on the

15 reasonable price for an unlimited license. These numbers have no factual basis. Mr. Hampton

16 does not vouch for their credibility, having failed to investigate any basis for them. They are

17 contradicted by economic reality. And Mr. Hampton has not used them as part of any opinion—

18 having failed to perform the analysis of what a reasonable buyer and seller would actually agree

19 to here. Hampton Depo. at 113:22-114:6; 118:14-119:11. If these numbers have any relevance in

20 this action, Netbula's percipient witnesses can present them. But to allow Mr. Hampton to

21 present those numbers to the jury as an "expert" would seriously prejudice Netbula and confuse

22 the jury, without probative value or relevance to any opinion he is prepared to offer. *See*

23 *Daubert*, 509 U.S. at 595; Fed. R. Evid. 703. Accordingly, the Court should order that

24 Mr. Hampton may not present these offers at trial, in addition to ordering that he may not present

25 any testimony as to the appropriate price for an unlimited runtime license.

**IX. MR. HAMPTON COULD NOT, AND DID NOT EVEN TRY TO, SUBSTANTIATE THAT NETBULA'S SOFTWARE MIGHT HAVE GIVEN CHORDIANT A TIME-TO-MARKET ADVANTAGE, SO HE SHOULD BE EXCLUDED FROM TESTIFYING ABOUT THAT SUBJECT.**

Mr. Hampton opined that the cost of Netbula's software does not necessarily equate to its value and that Netbula's software might have allowed ███████████████████████ ███████████████████████████████████████████████████ Rebuttal ¶ 5. But other than this vague and conclusory reference, Mr. Hampton provided zero factual or methodological support for this proposition that Netbula's RPC conferred ██████ ██████████████████ and his testimony on this subject should therefore be excluded.

In his deposition, Mr. Hampton could offer no factual basis for disputing Dr. Lynde's conclusion that Chordiant could have developed substitute RPC software itself in ███████ ██████████ Hampton Depo. at 164:19-165:8. Mr. Hampton could not articulate any market advantage Chordiant may have obtained by ████████████████████████████ if it had to develop RPC software itself. *Id.* Moreover, he had not even endeavored to investigate what market advantage Chordiant ██████████████████████████████ an alternative such as a solution developed internally. *Id.* at 165:6-8.

Because Mr. Hampton not only was unable to substantiate his opinion about any time-to-market advantage fostered by Netbula's RPC software, but also had failed to take the first step to gather facts about it, Mr. Hampton should be excluded from offering any opinion or testimony on that subject.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## CONCLUSION

For the reasons set forth herein and in the supporting papers, Defendants respectfully

request that the Court exclude Mr. Hampton's proposed expert testimony as enumerated above.

Dated:     November 9, 2009                    Respectfully submitted,

FENWICK & WEST LLP


By:_____/s/ Laurence F. Pulgram_____
                    Laurence F. Pulgram

Attorneys for Defendants
CHORDIANT SOFTWARE, INC.,
DEREK P. WITTE, and
STEVEN R. SPRINGSTEEL